Christopher S. Morris, Esq., SBN 163188
cmorris@morrislawfirmapc.com
Danielle R. Pena, Esq., SBN 286002
dpena@morrislawfirmapc.com
MORRIS LAW FIRM, APC
501 West Broadway, Suite 1480
San Diego, CA 92101
Telephone:  (619) 826-8060
Facsimile:   (619) 826-8065

James S. Terrell, Esq. SBN 170409
jim@talktoterrell.com
115411 Anacapa Road
Victorville, CA 92392
Telephone:  (760) 561-2699
Facsimile:   (760) 952-1085

Sharon J. Brunner, Esq. SBN 229931
Sharon.j.brunner@gmail.com
Law Office of Sharon J. Brunner
14393 Park Avenue, Suite 101
Victorville, CA 92392
Telephone:  (760) 243-9997
Facsimile:   (760) 843-8155

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PERRY BELDEN, an Individual, and ROBIN OLDS, an Individual,<br><br>              Plaintiffs,<br><br>     v.<br><br>THE COUNTY OF SAN BERNARDINO; DEPUTY HERRERA; and DOE DEPUTIES AND NURSES 1-10, inclusive,<br><br>              Defendants. | Case No.<br><br>**COMPLAINT FOR:**<br><br>**1. 42 U.S.C. § 1983 – Inadequate Medical**<br>**2. 42 U.S.C. § 1983 – Excessive Force**<br>**3. 42 U.S.C. § 1983 – Seizure**<br>**4. Civ Code § 52.1 – Bane Act**<br>**5. 42 U.S.C. § 1983 – Medical Program**<br>**6. Negligence**<br>**7. IIED**<br>**8. Battery** |

COMPLAINT                                          CASE NO.

# I.

## <u>INTRODUCTION</u>

1.      Plaintiff, Perry Belden (herein "Perry") has a big heart, and even bigger dreams.  That has not changed, even though his life has turned into a nightmare taken straight out of a scene from Misery.

2.      On March 16, 2018, following a small family scuffle, Plaintiff, Robin Olds (herein "Robin"), called the San Bernardino County Sheriff's Department (herein "SBC") to deescalate the matter between her husband and son, Perry.  Being told that the cops had been called, Perry ran away from home because he was afraid of going to jail.  SBC Deputies obtained a warrant for Perry's arrest for assault.  For the next ten days, Perry stayed away from home, sometimes resorting to sleeping on the street.  During that period, SBC Deputies harassed Robin and her family. SBC Deputies came to her house twice a day, demanding she turn Perry over or face arrest.  Each time she opened the door in response to SBC Deputies knocking, SBC Deputies forcefully entered her home, sticking their foot through the threshold of the door to prop it open.  SBC Deputies would enter the house and separate the family members (including Robin's special needs child) into different rooms, interrogating each, without a warrant.  On at least three occasions SBC Deputy Herrera threatened Robin stating if Perry didn't turn himself in, he would be shot when apprehended.  These repeated threats terrified Robin.  So much so that on March 27, 2018, Robin convinced Perry to turn himself in.

3.      That morning, Robin called SBC Deputies and advised them that Perry was going to surrender.  An unknown deputy told Robin not to drive him to the station or she too would be arrested.  The deputy asked her for Perry's location. Robin said she wanted to be there when they arrested him because she was afraid they would hurt him as Deputy Herrera threatened.  She then gave the Deputy Perry's location.

/ / /

COMPLAINT                                                      CASE NO.

4.      When Robin arrived at the house Perry was staying at, at last a dozen SBC Deputies were armed with assault rifles rushing towards the front door. Afraid of being shot as threatened, Perry shut the front door and hid in the attic. Once in the attic, scared for his life, Perry called his Mom, Robin, and asked her to hand the phone to the sergeant on scene.  Robin did.  Perry told the sergeant that he wanted to surrender but that he was scared of being shot.  The sergeant told Perry to come down from the attic.  While trying to get out of the attic, still on the phone with the sergeant, SBC Deputies deployed OC spray in the attic.  Because the OC spray impacted Perry's vision, he stepped in the wrong place and fell through the attic.  While lying on the ground in pain, Perry was tased twice immediately after falling from the attic.

5.      SBC Deputies arrested Perry and took him to Hi-Desert Medical Center for medical clearance.  Perry was noted to have several abrasions on his body from falling through the attic.  The doctors also noted that Perry would be going through withdrawals and withdrawal based seizures as he admitted to being a heroine user.  The doctors prescribed Perry Klonopin as a preventive drug for seizures.  The doctors also gave the jail strict medical instructions to take Perry's daily vital signs.

6.      That same day, March 27, 2018, SBC Deputies transported Perry to Morongo Basin, a Level-I facility that is not equipped with medical staff or a medical facility.  Nor was Morongo Basin equipped with tele-medicine or video-medicine services.

7.      On March 29, 2018, while in route to court, Perry recalls telling SBC Deputies that something was wrong and that he was seriously sick, "something different than withdrawals," SBC Deputies dismissed Perry's concerns and said, "that's what happens when you're a crack head."

8.      Despite advising SBC Deputies that he was seriously sick, on several occasions, and despite knowing about his withdrawals and related seizures, Perry

3

COMPLAINT                                                    CASE NO.

continued to be detained at Morongo Basin Jail without access to medical aid. While in jail, Perry's medical condition worsened. However, over the seven days kept in-custody, Perry's jail records indicate that he was not given any medical treatment while in-custody. Perry was in such dire straits, video surveillance will confirm that he was unconscious most of his time while in-custody and remained in the intake area.

9. On April 2, 2018, Perry was transported to court for his arraignment. Perry's Mother, Robin, was present in the court room. Robin claims Perry "looked like death" and had what she thought was bruising on his arms. Perry was escorted by two deputies that dragged him into the courtroom because he could not walk on his own. Despite his death-like appearance, "bruised" skin and inability to walk or communicate, SBC Deputies transported Perry back to Morongo Basin Jail.

10. Due to Perry's critical medical state, he does not remember anything after appearing in court on April 2, 2018. Because Perry's medical records indicate he was not medically treated, nor were his daily vitals taken as ordered, Plaintiffs are currently unaware of the factual happenings during April 2, 2018-April 4, 2018.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

4

COMPLAINT                                          CASE NO.

11.    On April 4, 2018, SBC staff finally transported Perry to Arrowhead Regional Medical Center.  When Perry arrived at Arrowhead Medical Center on April 4, 2018, he looked like this:

 

12.    According to medical records, when he arrived at Arrowhead Medical Center, Perry was in critical condition, suffering from "renal failure, sepsis and severe dehydration."  Perry's skin was "mottling" and he was "toxic appearing." His blood pressure was 149/94 with pulse of 179 on arrival to Arrowhead.  Perry's vital signs upon arriving at Arrowhead are "medically unimaginable" and cannot be reconciled with the supposed vitals (BP 81/53) taken of Perry by SBC staff prior to transport to Arrowhead, strongly indicating SBC staff intentionally recorded false vital signs in an effort to hide their mistreatment.

13.    According to medical professionals, it is not medically possible for a person to become so critically ill with severe dehydration and renal failure in less than three or four days without showing obvious signs of severe distress.  Meaning, SBC staff knew, as Robin did, that Perry was toxic-looking on April 2, 2018.  SBC staff also knew, or should have known, that something was seriously wrong, a fact Perry told staff time and time again. Instead of performing their duties like

/ / /

COMPLAINT                                                        CASE NO.

reasonable deputies and nurses, SBC staff intentionally ignored Perry's critical medical state.

14.    As a result of SBC's gross delay in obtaining medical treatment, in order to save his life, Arrowhead doctors were forced to <u>amputate both legs and Perry's left hand</u>.  Perry's right hand, though saved, is permanently scarred and deformed.



## II.

## <u>JURISDICTION AND VENUE</u>

15.    This action arises under the Constitution and laws, including Article III, Section 1 of the United States Constitution and is brought pursuant to 42 U.S.C. section 1983.  The Jurisdiction of this court is invoked pursuant to 28 U.S.C. section 1331 and 1343.  State law claims are alleged as well, over which Plaintiff invokes the Court's supplemental jurisdiction pursuant to 28 U.S.C. section 1367(a).

16.    This case is instituted in the United States District Court for the Central District of California pursuant to 28 U.S.C. section 1391, as the judicial district in which all relevant events and omissions occurred and in which

/ / /

COMPLAINT                                                    CASE NO.

Defendants maintain offices and/or reside.  The incident giving rise to this lawsuit occurred in San Bernardino County custody.

17.     On September 24, 2018, Perry filed a claim for the foregoing incident with San Bernardino County.  The claim was rejected on November 13, 2018.  The present complaint is timely, pursuant to California Government Code section 945.6.

## III.

## THE PARTIES

18.     Plaintiff Perry Belden, was a resident of San Bernardino County in the State of California at all times relevant to this complaint.  The actions by San Bernardino County staff that caused Perry's injuries occurred in San Bernardino County.

19.     Plaintiff Robin Olds, Perry's mom, was a resident of San Bernardino County in the State of California at all times relevant to this complaint.  The actions by San Bernardino County staff that caused her injuries occurred in San Bernardino County.

20.     Defendant San Bernardino County ("SBC") is and at all times mentioned herein, was a public entity authorized by law to establish certain departments responsible for enforcing the laws and protecting the welfare of the citizens of San Bernardino County.  At all times mentioned herein, SBC was responsible for overseeing the operation, management, and supervision of the SBC jails and the San Bernardino County Sheriff's Department, as well as the Sheriff's Deputies, Corrections Officers, and other SBC Medical Staff.

21.     Deputy Herrera was a SBC Deputy at all times mentioned herein.  He was empowered and authorized under the color of state law to perform his duties. Based on information and belief, Deputy Herrera was a resident of San Bernardino County in the State of California at all times relevant to this complaint, and worked in San Bernardino County when he violated Plaintiffs rights.

/ / /

COMPLAINT                                                          CASE NO.

22.     At all times relevant hereto, DOE defendants 1 through 10 were believed to be citizens of the United States and a resident of the State of California in San Bernardino County, and were acting under the color of state law in their capacity as a SBC staff.  All DOE defendants will be referred to as "DOE," "SBC Deputies," "SBC Nurses," or collectively as "SBC staff."

23.     Defendant DOES 1 through 10 are not known or identified at this time. On information and belief, Plaintiff alleges that each Doe is in some manner responsible for the wrongs alleged herein, and that each such Defendant advised, encouraged, participated in, ratified, directed, or conspired to do, the wrongful acts alleged herein.  When the true names and capacities of said Defendants become known, Plaintiff will seek relief to amend this complaint to show their true identities in place of their fictitious names as DOES 1 through 10.  Defendants, and each of them, were the agents, employees and servants of every other Defendant. Defendants acted in the course and scope of said agency, service and employment at all relevant times.

24.     At all times herein mentioned, DOES 1 through 10 were employees of Defendant CDCR.

## IV.

## FACTS RELEVANT TO ALL COUNTS

25.     On March 16, 2018, at approximately 1:00 a.m., Robin was hastily awoken by the sound of Perry moving the TV from the living room to his bed room.  As Robin and Perry were talking, Perry's stepfather, also hastily awoken, ran into the living room and tackled Perry thinking the disagreement was more than it was.  A small scuffle ensued.  Perry punched his stepfather.  In an effort to keep the peace, Robin called the San Bernardino County Sheriff's Department.  Robin never intended on having anyone arrested, nor did anyone press charges.  Once 911 was called, Perry left the residence fearful that he would be arrested.

/ / /

8

COMPLAINT                                              CASE NO.

26.     Within 10 minutes, multiple SBC Deputies arrive, including Deputy Herrera.  The deputies came into the house to investigate the issue.  They noticed Perry's stepfather was bleeding.  Because Perry had left the scene after punching his stepfather, SBC Deputies obtained a warrant for his arrest.

27.     During the time period of March 16, 2018, through March 27, 2018, Perry remained on the run.  SBC Deputies came to Robin's house every day, most times twice a day, searching for Perry.  Deputy Herrera, and his unknown DOE partner, performed approximately half of those visits to Robin's house.  On every occasion in which Deputy Herrera came to Robin's house, he would knock on the door and barge in without a warrant.  His unknown DOE partner would stand by the door propping it open with his foot.

28.     During each encounter Deputy Herrera had at Robin's house, he was aggressive, intimidating and harassing.  Deputy Herrera would forcefully enter Robin's house without a warrant.  He separated the family members (including Robin's special needs child) into different rooms, interrogating each, without a warrant.  Deputy Herrera threatened Robin, stating she would be charged with a crime if she did not disclose Perry's location.  The intimidation and harassment escalated daily.

29.     Throughout this period, Robin also noticed SBC Deputies following her when she was driving.

30.     On one instance during March 16, 2018, through March 27, 2018, unannounced and without a warrant, Robin caught Deputy Herrera, and other SBC Deputies, in her backyard, looking through her special needs son's bedroom window.  This terrified Robin because she thought her special needs son would make a sudden movement and be shot.

31.     Towards the end of this time period, Deputy Herrera intentionally lied to Robin telling her that Perry was in big trouble because he hurt a woman and

/ / /

9

COMPLAINT                                              CASE NO.

child and was facing serious charges.  Deputy Herrera lied to Robin for the purpose of scaring her into telling him where Perry was hiding.

32.    On at least three occasions SBC Deputy Herrera threatened Robin stating if Perry did not turn himself in, or that he she failed to get Perry to turn himself in, he would be shot when apprehended.  These repeated threats terrified Robin.  So much so that Robin convinced Perry to turn himself in.

33.    On March 27, 2018, Robin called SBC Deputies and advised them Perry wanted to turn himself in.  She told SBC Deputies that she wanted to be present when they arrested Perry due to Deputy Herrera's threats that he would be shot if apprehended.  Robin then gave SBC Deputies Perry's location.

34.    As Robin pulled up, at last a dozen SBC Deputies were armed with assault rifles rushing towards the front door.  Afraid of being shot as Deputy Herrera had threatened, Perry (thinking his mom was going to be outside) shut the front door and hid in the attic of the apartment building.

35.    Once in the attic, scared for his life, Perry called Robin, and asked her to hand the phone to the sergeant on scene.  Robin did.  Perry told the sergeant that he did not have any weapons and that he wanted to surrender but that he was scared of being shot.  The sergeant told Perry to come down from the attic.  Perry told the sergeant that he was lost in the attic of the apartment building.  The sergeant told Perry, "come back the way you got up."  While trying to get out of the attic, still on the phone with the sergeant, SBC Deputies deployed OC spray in the attic. Because the OC spray impacted Perry's vision, as intended, he stepped in the wrong place and fell through the attic.  While lying on the floor, SBC Deputies tased Perry twice.  One prong connected with Perry's penis, the other prong hit his stomach.  Perry screamed.  Robin thought the worst.  This deputy was wearing a black vest and tan pants, he was otherwise undercover.

36.    SBC Deputies arrested Perry and took him to Hi-Desert Medical Center for a jail medical clearance.  Perry was noted to have several abrasions on

COMPLAINT                                      CASE NO.

his body from falling through the attic.  The doctors also noted that Perry would be going through withdrawals and withdrawal based seizures.  The doctors prescribed Perry Klonopin as a preventive drug for seizures.  The doctors also gave the jail strict medical instructions to take Perry's vital signs daily.

37.     Following Perry's discharge from Hi-Desert Medical Center, as he was escorted to the patrol unit, without provocation or justification, Deputy Herrera threw Perry on the ground and kicked him in the head.  Perry was picked-up and thrown in the patrol unit.  Perry was then transferred to Morongo Basin Jail. Morongo Basin Jail is a Level-I facility that is not equipped with medical staff or a medical facility.  Nor was Morongo Basin equipped with tele-medicine or video-medicine services.

38.     Medical records indicate that Perry was not given the medication prescribed to him while detained at Morongo Basin.

39.     On March 29, 2018, while in route to court for his arraignment, Perry recalls telling SBC Deputies that something was wrong and that he was seriously sick, "something different than withdrawals," SBC Deputies dismissed Perry's concerns and said, "that's what happens when you're a crack head."  In fact, Perry recalls earlier in his detainment, advising SBC Nurses that he was seriously sick beyond withdrawals.  However, medical records indicate he was not treated or seen.

40.     Perry was in such dire straits, video surveillance will confirm that he was unconscious most of his time while in-custody and remained in the intake area, being bused between Morongo Basin and West Valley.

41.     On April 2, 2018, Perry was transported from West Valley to Morongo Basin Jail for the purpose of attending his arraignment later that day.  One of the last things Perry remembers is being pulled-up and dragged onto the transport bus from West Valley to court.

/ / /

/ / /

COMPLAINT                                                    CASE NO.

42.     While in the Morongo Basin holding cell, Perry recalls vomiting and being extremely ill.  In response to his pleas for medical attention, SBC Deputies entered the holding cell and repeatedly kicked Perry in the head.

43.     Perry's Mother, Robin, was present in the courtroom.  Robin claims Perry "looked like death" and that he was "pale," "weak," and "very sick looking." Robin also noticed what she thought was bruising on his arm.  Perry was dragged into the courtroom by two SBC Deputies because he could not walk on his own.

44.     As evidence of his horrid mistreatment, without any discussion with his family or his public defender, scared and in fear for his life, Perry took the first plea deal offered to him because he wanted to get out of local custody so that he could get adequate medical attention in prison.  The plea deal came with a two-year prison term.

45.     Following the arraignment, Robin immediately went to Morongo Basin Jail to see Perry.  She wanted to know why he looked so bad and why he took the plea deal.  When she arrived at Morongo Basin Jail, SBC Deputies denied Robin's request to see Perry because he "was under discipline."  Perry's jail records indicate he was never disciplined.  It is more likely, that SBC Deputies denied Robin's request because Perry was in bad health and was not receiving treatment, nor could he at Morongo Basin Jail.

46.     Despite his death-like appearance, "bruised" skin and inability to walk or communicate, Perry remained at Morongo Basin Jail on the night of April 2, 2018.

47.     Due to Perry's critical medical state, he does not remember anything after appearing in court on April 2, 2018.  Because Perry's medical records indicate he was not medically treated, nor were his daily vitals taken as ordered, Plaintiffs are currently unaware of the factual happenings during April 2, 2018-April 4, 2018.

/ / /

/ / /

COMPLAINT                                              CASE NO.

48.     However, Perry's jail records indicate he was transferred to West Valley on April 3, 2018.  April 3, 2018, was the first time Perry started to receive medications as ordered by Hi-Desert.

49.     On April 4, 2018, at approximately 10:22, SBC staff took Perry's vitals.  His blood pressure reading was 145/98, and Perry had defecated in his pants and complained of severe abdominal pain.  Nothing was done.  Three hours later, while Perry remained unconscious in his cell, SBC Nurses finally requested he be transported to Arrowhead.

50.     Other records indicate, SBC staff transported Perry to Arrowhead Regional Medical Center because he was "weak and vomiting."

51.     When Perry arrived at Arrowhead, he was in critical condition. Hospital records indicate his blood pressure was 149/94.  His pulse rate was 179. Upon arrival, Perry was experiencing severe septic shock, renal failure, and severe dehydration.  On further examination, a nurse's note indicates, Perry was confused with an altered mental state.  He was "toxic appearing" and his skin was "mottling."

52.     Hospital records indicate Perry was "toxic appearing."  With dry mucous membranes, he was tachycardic (fast heart rate), he showed "increased work of breathing," he was also tachypnic (breathing rapidly), and he had signs of subcostal retractions (signs of difficulty breathing).  The records noted "skin mottling," which is an ominous and obvious sign of septic shock and poor limb circulation.

53.     Lab tests confirmed that Perry had a lactate level of 13.26 (normal level being less than 2.0), indicating severe metabolic acidosis with shock.  A lactate level of 13 is associated with death.  A procalcitonin test came back with a value of 967 (normal level less than .08), indicating severe life-threatening bacterial sepsis.  Perry's creatinine level was 4.7 (normal level less than 1.5), indicating severe dehydration and acute renal failure.  Perry's white blood count was 21,700, suggesting he was also suffering from an infection.

COMPLAINT                                              CASE NO.

54.     Perry was given multiple intravenous antibiotics to treat the septic shock.  His respiratory rate increased to 48 as he tried to breathe out extra carbon dioxide to reduce his serve metabolic acidosis.  He could not breathe fast enough to compensate for the acidosis, resulting in respiratory failure.  Perry went into cardiac arrest, but was successfully resuscitated within three minutes.  However, his blood pressure remained critically low as a result from the septic shock requiring intravenous infusion of vasopressors to maintain Perry's blood circulation in order to keep him alive.

55.     Ultimately, Arrowhead doctors were able to spare Perry's life – but not completely.  In order to save him, doctors amputated Perry's legs and left hand as severe septic shock stopped the circulation of blood in Perry's extremities.

56.     Unfortunately Perry is not alone.  Perry's loss of limbs extends further than SBC Nurses and Deputies.  Perry's injuries are a direct result of the county's refusal to remedy its <u>known and systemic failures.</u>

57.     Several custodial inmates have died or been grossly injured in county custody as a result of inadequate medical care.  In *Rahshun Turner v. County of San Bernardino,* the county acknowledged and admitted that its medical policies and training were constitutionally inadequate, and the cause of preventable inmate injuries, in the Medical Remedial Plan, filed on June 7, 2016.  The Medical Remedial Plan was put into effect as a starting point in *Rahshun,* a class action lawsuit filed by several inmates injured in SBC jails due to inadequate medical care.  (Exh. 1.)  The Medical Remedial Plan was an agreement by the county, and Prison Law Group, to allow neutral experts into the jails for the purpose of evaluating the jail's medical polices and training, and recommending modifications thereon.

58.     In paragraph 42 of the Medical Remedial Plan, the county states, "…there exists probable cause to believe that violations of the federal rights of plaintiffs have occurred sufficient to warrant the relief contained herein."  Meaning,

14

the county knew its medical policies and training was constitutionally inadequate at the time Perry was injured.  Yet, to date, these corrections have not been implemented.

59.    The Medical Remedial Plan allowed for a two year evaluation process, which ultimately resulted in a consent decree that incorporated an amended Medical Remedial Plan setting forth the changes that needed to be made in the jails.

60.    The consent decree incorporated the opinions and recommendations of the neutral experts.  Therein, the experts outlined the changes necessary to provide adequate medical care to inmates and provided a detailed process for medical intake in order to avoid deaths and injuries such as Perry's.  Namely, the county agreed to hire more screening nurses, modify the screening questionnaire, and agreed to implement, at a minimum, tele-medicine services at Level-I facilities like Morongo basin Jail. None of this had been implemented prior to Perry's injuries.  (Exh. 2.)

61.    Furthermore, the consent decree specifically addresses the dangers of Level-I jails in regards to a complete inability to provide medical screening or treatment.  Namely, the consent decree was to improve the substandard medical screening and to individuals experiencing detoxification, serious medical issues and to eliminate housing "high risk" individuals at Level 1 (like Morongo) facilities that did not monitor or provide simple medical screening such as pulse or blood pressure or monitor overdoses/detoxification of prisoners.  Other changes include implementation of an adequate electronic health care record, mandatory vital sign measurements performed at intake, solicitation of information and conditions of arrest, etc.

62.    The County agreed to be governed by the consent decree because public pressure was mounting against it as a result of harsh media publications exposing the county's horrid death rate, especially pertaining to medical-related deaths.  Examples of publications exposing the county's death epidemic are: / / /

COMPLAINT                                          CASE NO.

63.   "Deaths Among County's Inmates Continue at an Accelerated Pace" published on December 19, 2016.  (Exh. 3.)

64.   "More Deaths at San Bernardino County's West Valley Detention Center" published on March 10, 2017.  (Exh. 4.)

65.   "San Bernardino County: Rising Number of Jail Death Raise Concern" published on April 12, 2016.  (Exh. 5.)

66.   "Inmate deaths at San Bernardino County Highlights Medical Care Issues" published on October 20, 2017.  (Exh. 6.)

67.   "Deaths at San Bernardino County Jails Sounding an Alarm" also published on October 20, 2017.  (Exh. 7.)

68.   As suggested by the headlines, these publications made note that San Bernardino County Jails had an outrageously high rate of medical-related deaths. One publication, dated October 20, 2017, stated, "in the last three years, 30 people have died in San Bernardino County jails with 18 of those deaths, or 60 percent, being medical-related, according to Sheriff's Department figures."  The article continued, "Last year, eight of 10 in-custody deaths, or 80 percent, were found to be medical-related while so far this year, four of eight in-custody deaths, or 50 percent, were determined to be medical related according to the Sheriff's Department."  This rate appears higher than any other California county.

69.   That same article, "Inmate deaths at San Bernardino County Highlights Medical Care Issues," references a former SBC jail nurses who spoke out about the county's "problem" with medical inmates.  The former nurse spoke out claiming she could no longer remain working at the jail, under the current medical program, in fear of losing her nursing license.  She is now suing the county.

70.   Accordingly, combining the consent decree, media publications, sheer number of medical related deaths per year, and the preventable circumstances of the injuries/deaths, the county was undoubtedly on notice that it needed to modify its

16

medical procedures and training program, in general.  The county was also on notice that serious medical inmates should not be housed in Level 1 jails that did not have medical staff.

71.    However, to date, despite explicit notice, the county continues its unconstitutional practices by failing to remedy any of the issues outlined in the consent decree.  As such, the county's deliberate indifference was a moving force in Perry's injuries.

72.    Perry's injuries are as indescribable as his will to live.  For all intents and purposes, given the gross delay in medical attention, Perry was at death's door when he arrived at Arrowhead Medical Center.  In fact, he did die, and it took hospital staff three minutes of resuscitative measures to bring him back to life. Though successful, as a result of the severe sepsis and renal failure, Perry's blood flow was compromised, ultimately causing Perry's legs and left hand to be amputated.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

COMPLAINT                                                    CASE NO.

73.     Perry was 27, and had a whole healthy and active life ahead of him. Now, he looks down at his legs and sees a stranger he does not want know. Perry will forever need the medical means to live as a paraplegic.  He will always need assistance, as he cannot do most living activities without help from Robin.  Aside from his medical needs, Perry now suffers from severe emotional distress sometimes manifesting in suicidal thoughts.  Perry still struggles with the fact that life as he knew it will never be the same.



### V.

### FIRST CAUSE OF ACTION

### 42 U.S.C. Section 1983 – 14th Amendment – Inadequate Medical Care

### [By Perry Against SBC DOE Deputy, Nurses and Staff 1-20]

74.     Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

75.     On March 28, 2018, Perry told DOE Deputies transporting him to court that he was "seriously sick, something other than withdrawals."  In response DOE deputies ignored Perry's complaints and said something to the effect of "that's what happens when you're a crack head."  These DOE Deputies intentionally and maliciously ignored Perry's medical distress.

/ / /

COMPLAINT                                                    CASE NO.

76.    On April 2, 2018, Perry could not walk on his own and had to be dragged to the transport bus and inside the court room by DOE deputies.  When Robin saw Perry in court, she thought he "looked like death."  She saw what she thought was bruises on his arm but what we know now to be mottling and toxicity.  Perry could not walk or talk.  These DOE Deputies intentionally and maliciously ignored Perry's medical distress.

77.    Once Perry was transferred back to Morongo Basin or West Valley following his court appearance he was screened by DOE Nurses.  These DOE Nurses, along with any other DOE Nurses that had the opportunity to evaluate Perry, or administer medication to Perry, recognized, or should recognized, that he was in critical condition deteriorating over a period of several days.  These DOE Nurses recognized that Perry was weak, confused, and toxic appearing.  They also knew Perry had chills and vomiting episodes.  These DOE Nurses, purposefully or ignorantly ignored Perry's severe medical distress.  This is especially so because Perry was in a semi-unconscious state following his April 2, 2018, court appearance.

78.    The DOE Nurses and Deputies that treated Perry on April 4, 2018, would have to be blind to miss the obvious physical distress Perry was in.  According to hospital doctors at Arrowhead, Perry was in critical condition when he arrived, a condition that would have physically manifested in obvious ways three to four days prior, which correlates with Robin's observations on April 2, 2018.  Accordingly, SBC staff knew, or should have known, Perry was in serious medical distress but failed to summon care.

79.    The DOE Nurses and Deputies who fraudulently performed and/or scribed Perry's vital signs prior to transport knew Perry needed medical treatment days before.  These Defendants intentionally altered the medical records for the purpose of hiding Perry's mistreatment at the hands of SBC Staff.

/ / /

19

COMPLAINT                                                    CASE NO.

80.     Each of these DOE SBC Staff members made an intentional decision not to summon medical care despite Perry's obvious and voiced medical distress. Their collective and repeated decisions violated the standard of care by failing to act reasonably, i.e., summon care.  Their decisions were ignorant, intentional, and malicious.

81.     By failing to summon medical care, Perry fell into a critical state developing renal failure and septic shock, ultimately causing amputation of both legs 10 inches below the knee, partial amputation of the left hand, and a permanently deformed right hand.

82.     Each DOE Defendant is responsible for Perry's injuries as transport to the hospital even 24 hours prior would have likely spared Perry's limbs.

83.     Perry can no longer shower himself, or cook for himself.  He cannot use the restroom by himself, nor can he control his bowel movements.  Many times in public Perry will pee himself without warning.  When he feels the warmth coming down his thigh he begins to cry.  Perry cannot perform sexually and will never be able to have children.  He cannot even look at himself.  This has taken an extreme toll on Perry emotionally.  As can be predicated, sometimes it gets the better of him and he contemplates suicide.

84.     All of this could have been avoided but for SBC Staffs' deliberate and repeated indifference.  Because of his injuries, Perry is entitled to money damages pursuant to 42 U.S.C. section 1983 to compensate him for his injuries and for the violation of his Constitutional and civil rights.

85.     In addition to compensatory, economic, consequential, and special damages, Plaintiffs are entitled to punitive damages against each of the individually named DOE Staff members under 42 U.S.C. section 1983, in that the actions of each of these individual defendants have been taken maliciously, willfully, or with a reckless disregard or wanton disregard for Perry's constitutional rights.

/ / /

COMPLAINT                                        CASE NO.

# VI.

## SECOND CAUSE OF ACTION

### 42 U.S.C. Section 1983 – 14th Amendment – Excessive Force

### [By Perry Against Deputy Herrera and SBC DOE Deputies 1-20]

86.     Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

87.     Because Perry was a pretrial detainee at all times mentioned herein, all use of force utilized by SBC Deputies must be objectively reasonable in light of the circumstances.

88.     The first occasion of force used against Perry was on the day of his arrest.  After arriving on scene where Perry was hiding, after being told by Robin that Perry was going to turn himself in, Perry contacted the sergeant on scene to tell the sergeant that he wanted to surrender but was afraid of being shot.  Perry told the sergeant he was not armed.  The sergeant told SBC Deputies to put their weapons down so that Perry could surrender.  Perry tried to get out of the attic but was lost.  Robin overheard the sergeant tell Perry, "get out the same way you got up."  As Perry was tracing back his steps, SBC Deputies deployed OC spray in the attic.  The OC spray operated as intended by compromising Perry's vision.  As a result, Perry stepped wrong and fell through the attic.

89.     Immediately after falling, Perry was lying hurt on the ground.  He did not pose a threat or danger to SBC Deputies, nor was he armed.  Suddenly, Perry was tased 2 to 4 times by a DOE Deputy in a black vest and tan pants.  Perry screamed in pain.

90.     Next, after being taken to Hi-Desert for jail clearance, on the way back to the patrol unit, Deputy Herrera threw Perry on the ground and kicked him in the head.  Again, Perry was not posing a threat as he was hand-cuffed, complaint and calm.

/ / /

21

91.     On April 2, 2018, Perry was transported from West Valley to Morongo Basin Jail for the purpose of attending his arraignment later that day.  While in the Morongo Basin holding cell, Perry recalls vomiting and being extremely ill.  In response to his pleas for medical attention, SBC DOE Deputies entered the holding cell and repeatedly kicked Perry in the head.  Again, Perry was not posing a threat as he was detained, sick and begging for medical help.

92.     Each of the DOE Deputies referred to above acted intentionally with no other purpose but to inflict pain.  At no time referenced above did Perry pose a risk of bodily harm to any SBC staff member.  In fact, Perry had voiced a desire to surrender prior to SBC Deputies arrival and again when they were on scene.  He was actively trying to surrender when they deployed OC spray and tased him 2 to 4 times.

93.     The other occasions that force was used on Perry is when he was requesting medical help, obviously not acting as a threat to SBC Staff, nor is any such non-complaint conduct mentioned in Perry's jail records.

94.     DOE Deputies' actions and use of force as described herein was unreasonable, malicious and/or reckless, callous, and deliberately indifferent to Perry's protected rights.  The use of deadly force by DOE Deputies, and each of them, shocks the conscience and violates Perry's constitutional rights.

95.     The individual Defendants acted in concert and joint action with each other.

96.     None of the DOE Deputies took reasonable steps to protect Plaintiff from the objectively unreasonable and conscience shocking excessive force of other DOE Deputies, despite being in a position to do so.  They are each, therefore, liable for the injuries and damages resulting from the objectively unreasonable and conscious shocking force of each other.

97.     As a direct and proximate result of the wrongful conduct of each of DOE Deputy, Perry has been substantially injured as referenced above.

22

COMPLAINT                                              CASE NO.

98.    Because of his injuries, Perry is entitled to money damages pursuant to 42 U.S.C. section 1983 to compensate him for his injuries and for the violation of his Constitutional and civil rights.

99.    In addition to compensatory, economic, consequential, and special damages, Plaintiffs are entitled to punitive damages against each of the individually named Defendants under 42 U.S.C. section 1983, in that the actions of each of these individual defendants have been taken maliciously, willfully, or with a reckless disregard or wanton disregard for Perry's constitutional rights.

## VII.

## THIRD CAUSE OF ACTION

**42 U.S.C. Section 1983 – 4th Amendment Unreasonable Seizure of Property and Person**

**[By Robin Against Deputy Herrera and DOE Deputies 1-20]**

100.    Plaintiffs realleges and incorporate by reference all paragraphs stated above, as though fully set forth herein.

101.    After Perry's arrest warrant had been issued, Deputy Herrera, and his unknown DOE partner, on at least six occasions forced themselves into Robin's house without a warrant.  Though SBC Deputies had an arrest warrant for Perry, they did not have a search warrant to enter Robin's home.  On every occasion in which Deputy Herrera came to Robin's house, he would knock on the door and barge in without a warrant.  His unknown DOE partner would stand by the door propping it open with his foot.  Each encounter would last approximately 25 to 30 minutes, sometimes longer.

102.    During each encounter, Deputy Herrera, and his unknown DOE partner, separated the family members (including Robin's special needs child) into different rooms, interrogating each, without a warrant.  During this time, Robin was not free to leave, as she was detained every time Deputy Herrera executed a drive-by visit.  Notably, on the 10 or so occasions in which other SBC Deputies knocked

23

1   on Robin's door to determine if Perry was there, none of them – unlike Herrera –

2   attempted to violate Robin's rights by entering her home and interrogating each

3   family member.

4       103.   On one instance, unannounced and without a warrant, Robin caught

5   Deputy Herrera, and other DOE SBC Deputies, in her backyard, looking through

6   her special needs son's bedroom window.  Again, DOE Deputies intentionally

7   entered Robin's backyard without a warrant or other exigent circumstances.

8       104.   Deputy Herrera and other DOE Deputies intentionally seized Robin

9   and her home, on multiple occasions, without a warrant.  He and others acted

10   brazenly and without regard for the constitution.  Their conduct was grotesque and

11   done with the sole intention of intimidating Robin and her family.

12       105.   This conduct placed Robin in constant fear that her home was not safe,

13   and that her family was not safe.  This fear caused severe emotional distress.  Robin

14   was unable to sleep or eat, she was scared for both of her sons' life, as she thought

15   the Deputies wanted to shoot Perry.

16       106.   As a direct and proximate result of the wrongful conduct of each DOE

17   Deputy, Robin has been substantially injured as referenced above.

18       107.   Because of her injuries, Robin is entitled to money damages pursuant

19   to 42 U.S.C. section 1983 to compensate for her injuries and for the violation of her

20   Constitutional and civil rights.

21       108.   In addition to compensatory, economic, consequential, and special

22   damages, Robin is entitled to punitive damages against Deputy Herrera and other

23   DOE Deputies under 42 U.S.C. section 1983, in that the actions of each of these

24   individual defendants have been taken maliciously, willfully, or with a reckless

25   disregard or wanton disregard for Robin's constitutional rights.

26   ///

27   ///

28   ///

24

COMPLAINT                                    CASE NO.

## VIII.

## <u>FOURTH CAUSE OF ACTION</u>

### Interference With Right By Threat, Intimidation, or Coercion –

### Bane Act - Civil Code § 52.1

### [By Robin Against Deputy Herrera and DOE Deputies 1-20]

109.   Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

110.   The moment an arrest warrant was issued in Perry's name Deputy Herrera knew he would be the one to apprehend Perry.  That why he made it his unconstitutional mission to harass and intimidate Robin into disclosing his location.

111.   Deputy Herrera and other DOE Deputies barged into Robin's home aggressively.  He would yell at Robin and ordered her to separate from the other family members.  Deputy Herrera told Robin that she would be charged with crimes if she did not turn Perry over.

112.   Deputy Herrera and other DOE Deputies would intimidate Robin by following her around when she was driving.

113.   The intimidation and harassment escalated daily.

114.   On one instance during March 16, 2018, through March 27, 2018, unannounced and without a warrant, Robin caught Deputy Herrera, and other SBC Deputies, in her backyard, looking through her special needs son's bedroom window.  This terrified Robin because she thought her special needs son would make a sudden movement and be shot.  Robin thought Deputy Herrera was intimidating her for the purpose of exchanging the safety of one son for the surrender of another son.

115.   Towards the end of this time period, Deputy Herrera intentionally lied to Robin telling her that Perry was in big trouble because he hurt a woman and child and was facing serious charges.  Deputy Herrera lied to Robin for the purpose of scaring her into telling him where Perry was hiding.

COMPLAINT                                          CASE NO.

116.    Furthermore, on at least three occasions, SBC Deputy Herrera threatened Robin stating if Perry did not turn himself in, or that she failed to get Perry to turn himself in, he would be shot when apprehended.  These repeated threats terrified Robin.

117.    As detailed above, Deputy Herrera and other DOE Deputies, by threat, intimidation, and fear, intentionally interfered with Robin's civil rights by trying and succeeding in preventing Robin from doing what she had the right to do under the law, as well as forcing Robin to do something that she was not required to do under the law.

118.    Based on these facts, Deputy Herrera and other DOE Deputies intentionally intimidated Robin at her home, on multiple occasions, without a warrant.  He and others acted brazenly and without regard for the constitution. Their conduct was grotesque and done with the sole intention of intimidating Robin and her family.

119.    This conduct placed Robin in constant fear that her home was not safe, and that her family was not safe.  This fear caused severe emotional distress.  Robin was unable to sleep or eat, she was scared for both of her sons' lives, as she thought the Deputies wanted to shoot Perry.

120.    As a direct and proximate result of the wrongful conduct of each of DOE Deputy, Robin has been substantially injured as referenced above.

121.    Because of her injuries, Robin is entitled to money damages pursuant to 42 U.S.C. section 1983 to compensate for her injuries and for the violation of her Constitutional and civil rights.  These actions were intended to deprive Robin of her enjoyment in her sons' safety and in the safety of her own home.

122.    As a direct and proximate result of the wrongful conduct of each DOE Deputy, Robin has been substantially injured as referenced above.

/ / /

/ / /

COMPLAINT                                                    CASE NO.

123.   Because of her injuries, Robin is entitled to money damages pursuant to 42 U.S.C. section 1983 to compensate for her injuries and for the violation of her Constitutional and civil rights.

124.   In addition to compensatory, economic, consequential, and special damages, Robin is entitled to punitive damages against Deputy Herrera and other DOE Deputies under 42 U.S.C. section 1983, in that the actions of each of these individual defendants have been taken maliciously, willfully, or with a reckless disregard or wanton disregard for Robin's constitutional rights.

## IX.

## FIFTH CAUSE OF ACTION

### 42 U.S.C. Section 1983 – 14th Amendment –

### Unconstitutional Medical Program (Policies and Training)

### [By Perry Against County of San Bernardino]

125.   Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

126.   Alternatively, or in conjunction with SBC Deputies' deliberate indifference, the county itself was a moving force causing Perry's injuries because it was on notice that its systemic failures regarding its custodial medical program was directly causing medical-related injuries and deaths.

127.   The breadth of the county's wholly inadequate medical program is vast.

128.   As litigated previously and currently, the county continues to utilize its Level-I jails to detain and house severely ill inmates knowing the jail is not equipped with medically trained staff or a treatment facility.  If an inmate is severely ill at Morongo Basin they are routinely ignored because SBC deputies know there is nothing that can be done.

129.   At Morongo Basin there is a custom and practice of maliciously ignoring severely ill inmates, and even using force on inmates because their ill,

27

because doing otherwise would require SBC Deputies to constantly transport inmates to the hospital for medical evaluation, and for the county to foot the bill. So instead, there is a culture of blatantly ignoring medically ill inmates.

130.  In general, the county has a policy or long-standing custom and practice, which was acted on by SBC DOE Staff, of not providing immediate screening by a registered nurse to evaluate the overall physical fitness of those in custody.

131.  In general, the county has a policy or long-standing custom and practice, which was acted on by SBC DOE Staff, of failing to transport severely ill inmates to an advanced medical treatment facility in a timely fashion.  There have been several reported instances of inmates that died or were severely injured because the jail did not timely transfer the inmate and attempted to treat the severe condition in the jail rather than at advanced medical treatment facility.  As here, the motive behind this custom and practice is to obfuscate the truth by hiding SBC staffs' mistreatment.

132.  The county also has a policy or long-standing custom and practice of employing and retaining as deputy sheriffs and correctional officers at Morongo Basin individuals whom Defendant county at all times material herein knew or reasonably should have known had dangerous propensities for (1) abusing their authority, (2) not providing medical care or immediate screening by a nurse to evaluate the overall physical fitness of those in custody for incarceration, and (3) not providing proper medical attention and care.

133.  The county has a policy or long-standing custom and practice, which was acted on by SBC DOE Staff, of mistreating inmates while transporting them within the Morongo Basin, and a policy of mishandling situations with individuals who suffer from critical health issues.

134.  The county continues to foster a culture of deliberate indifference in that it does not adequately train its staff on how to property treat medically ill

COMPLAINT                                                    CASE NO.

inmates, especially those suffering from comorbidity, i.e., more than one medical condition, such as withdrawals and additional medical complications.  Most SBC staff members do not obtain continuing training on policies and procedures other than the initial orientation training.

135.   These allegations are not new or profound.  These issues have been widely publicized and litigated – prior to Perry's injuries.  As such, the county is not only on notice of these <u>exact</u> failures, it admitted to them in a recent case entitled *Rahshun Turner v. County of San Bernardino*, Case No. 16-cv-355-VAP-DTB.

136.   *Rahshun Turner v. County of San Bernardino,* is a class action lawsuit filed by several inmates injured in SBC jails due to inadequate medical care.  The county was forced to face the music by admitting its medical policies and training were constitutionally inadequate.  As a means of disposing of the lawsuit, the county agreed to make changes.  The Medical Remedial Plan was put into effect as a starting point.  The Medical Remedial Plan was an agreement by the county to allow neutral experts into the jails for the purpose of evaluating its medical polices and training, and recommending modifications thereon.

137.   In paragraph 42 of the Medical Remedial Plan, the county states, "… there exists probable cause to believe that violations of the federal rights of plaintiffs have occurred sufficient to warrant the relief contained herein."  Meaning, the county knew its medical policies and training was constitutionally inadequate in <u>June of 2016</u> – two years before Perry was injured.  Yet, to date, these corrections have not been implemented.

138.   The Medical Remedial Plan incorporated a two year evaluation process, which ultimately resulted in a consent decree.

139.   The consent decree incorporated the opinions and recommendations of the neutral experts.  Therein, the experts outlined the changes necessary to provide adequate medical care to inmates and provided a detailed process for medical intake

COMPLAINT                                    CASE NO.

in order to avoid deaths and injuries such as Perry's.  Namely, the county agreed to hire more screening nurses, modify the screening questionnaire, and agreed to implement, at a minimum, tele-medicine services at Level-I facilities like Morongo basin Jail. None of this had been implemented prior to Perry's injuries.  (Exh. 2.)

140.   Furthermore, the consent decree specifically addresses the dangers of Level-I jails in regards to a complete inability to provide medical screening or treatment.  Notably, the consent decree was to improve the substandard medical screening and to individuals experiencing detoxification, serious medical issues and to eliminate housing "high risk" individuals at Level 1 (like Morongo) facilities that did not monitor or provide simple medical screening such as pulse or blood pressure or monitor overdoses/detoxification of prisoners.

141.   Other changes include implementation of an adequate electronic health care record, mandatory vital sign measurements performed at intake, solicitation of information and conditions of arrest, etc.

142.   The County agreed to be governed by the consent decree because public pressure was mounting against it as a result of harsh media publications exposing the county's horrid death rate, especially pertaining to medical-related deaths. Examples of publications exposing the county's death epidemic are:

143.   "Deaths Among County's Inmates Continue at an Accelerated Pace" published on December 19, 2016.  (Exh. 3.)

144.   "More Deaths at San Bernardino County's West Valley Detention Center" published on March 10, 2017.  (Exh. 4.)

145.   "San Bernardino County: Rising Number of Jail Death Raise Concern" published on April 12, 2016.  (Exh. 5.)

146.   "Inmate deaths at San Bernardino County Highlights Medical Care Issues" published on October 20, 2017.  (Exh. 6.)

147.   "Deaths at San Bernardino County Jails Sounding an Alarm" also published on October 20, 2017.  (Exh. 7.)

COMPLAINT                                                    CASE NO.

148.   As suggested by the headlines, these publications made note that San Bernardino County Jails had an outrageously high rate of medical-related deaths. One publication, dated October 20, 2017, stated, "in the last three years, 30 people have died in San Bernardino County jails with 18 of those deaths, or 60 percent, being medical-related, according to Sheriff's Department figures."  The article continued, "Last year, eight of 10 in-custody deaths, or 80 percent, were found to be medical-related while so far this year, four of eight in-custody deaths, or 50 percent, were determined to be medical related according to the Sheriff's Department."  This rate appears higher than any other California county.

149.   That same article, "Inmate deaths at San Bernardino County Highlights Medical Care Issues," references a former SBC jail nurses who spoke out about the county's "problem" with medical inmates.  The former nurse spoke out claiming she could no longer remain working at the jail, under the current medical program, in fear of losing her nursing license.  She is now suing the county.

150.   The consent decree, the media-lashing, and the raw numbers of medical-related deaths and injuries were not the only clues that the county's custodial medical program was causing deaths and severe injuries -- the deaths and injuries themselves, upon review, clearly indicate, in most cases, the death or severe injury could have been avoided had staff acted appropriately or had the medical program been modified.  Those preventable deaths and severe injuries created a pre-existing pattern of similar violations that put the county on notice that if it did not make real changes more inmates would die as a result of its unconstitutional medical program.

151.   In 2017 – the year pre-dating Perry's injuries there were several preventable medical-related deaths putting the county on notice that its program needed modification.  (Note, Plaintiffs are limited in their access to this information

/ / /

COMPLAINT                                                                      CASE NO.

prior to discovery.  At this stage, Plaintiffs can only depend on instances reported in the local media, which mainly focuses on high-profile deaths.)

152.   Betty Lozano died on August 26, 2017, in-custody due to medical complications that went intentionally ignored.  SBC Deputies knew Lozano was experiencing a medical emergency, yet failed to act.

153.   Jacob Hoyo died on September 24, 2017, in-custody due to a seizure that was not responded to.  Jacob Hoyo had just been involved in a car accident prior to his arrest on that same day.  Hoyo was never taken for medical clearance.

154.   Henry Simmons died on August 29, 2017, in-custody.  Deputies knew Simmons was in a critical medical state after removing him from the hospital without first being discharged.  Simmons was placed in a cell and went ignored until he was found dead.

155.   Shaun Greene died in December of 2016, in-custody.  Greene was a medical inmate that lost consciousness and slipped out of his wheelchair.  SBC Deputies delayed in obtaining medical transport to a medical facility, ultimately causing his death.

156.   George Topete and Zachery Shovey filed a lawsuit against the county in 2016 alleging treatment for the roughly 6,000 inmates at West Valley and the county's three other jails is so deficient that it is harming the people it aims to serve.  That lawsuit was re-filed adding Rahshun Turner, Monique Lewis, Jamie Jaramillo, and Joshua Mills.  This is the class action lawsuit that ultimately ended in the consent decree referenced throughout this complaint.

157.   Accordingly, combining 1) the consent decree, 2) the media publications, 3) the sheer number of medical related deaths per year, and 4) the pre-existing pattern of preventable medical-related injuries/deaths, the county was <u>undoubtedly on notice</u> that it needed to modify its medical procedures and training program; and, that severely ill inmates should not be housed in Level 1 jails that did not have medical staff.

COMPLAINT                                                    CASE NO.

158.   Based on all of this pre-existing notice, it is more than probable that internal county documents will indicate acknowledgment and admissions that's its medical program needed to be modified but feared doing so would subject it to harsher litigation settlements and verdicts.  Either way, the county has not implemented any changes to its program, not even the ones recommended in the consent decree.  As such, the county's failure to correct its known inadequacies was a moving force in Perry's injuries.

159.   Perry can no longer shower himself, or cook for himself.  He cannot use the restroom by himself, nor can he control his bowel movements.  Many times in public Perry will pee himself without warning.  When he feels the warmth coming down his thigh he begins to cry.  Perry cannot perform sexually and will never be able to have children.  He cannot even look at himself.  This has taken an extreme toll on Perry emotionally.  As can be predicated, sometimes it gets the better of him and he contemplates suicide.

160.   All of this could have been avoided but for the county's deliberate and repeated indifference.  Because of his injuries, Perry is entitled to money damages pursuant to 42 U.S.C. section 1983 to compensate him for his injuries and for the violation of his Constitutional and civil rights.

## X.

## SIXTH CAUSE OF ACTION

### Negligence

### [By Perry and Robin Against All Defendants]

161.   Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

162.   On or before the date, time, and places alleged herein, SBC DOE Deputies were charged with the duty to act in accordance with the laws of state and those that govern reasonable use of force SBC DOE Deputies owed the public — / / /

33

including Perry – a duty to act reasonably and summon medical care under the circumstances.

163.   Based on the facts detailed in the first cause of action, each SBC DOE Deputy and Nurse knew or should have known that Perry was in critical condition and in need of medical attention.  On a few occasions Perry recalls telling SBC DOE Deputies and Nurses that he was seriously sick, beyond withdrawals.  Each ignored him.  As did the SBC DOE Staff that saw or evaluated Perry following April 2, 2018, when his skin was visibly toxic appearing and he was weak and semi-unconscious.  SBC DOE Staff knew, or should have known, that Perry was in a critical state and needed immediate medical attention.  Still, each failed to summon care.

164.   Based on DOE Defendants unreasonable and malicious conduct in failing to summon medical care, the county is also liable pursuant to Government Code section 845.6.

165.   Based on the facts detailed in the first cause of action, each SBC DOE Deputy knew or should have known that using force under the circumstance was unreasonable as Perry was actively surrendering, retrained or clam and complaint at the time unreasonable force was used.

166.   Based on the facts detailed in the fourth cause of action, Deputy Herrera and other SBC DOE Deputies knew it was negligent and unreasonable to harass Robin as described.

167.   Defendants' breach of duty actually and proximately caused Perry to incur the injuries described above.

168.   By the acts alleged above, Defendants were negligent and breached their duty of due care owed to Plaintiff, entitling him to damages in an amount to be proven at trial.

/ / /

/ / /

COMPLAINT                                      CASE NO.

# XI.

## SEVENTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

### [By Perry and Robin Against Deputy Herrera and DOE Staff 1-20]

169.   Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

170.   Deputy Herrera and other DOE Deputies' conduct is the definition of conduct that shocks the conscience.  Defendants intentionally harassed and intimidated Robin.  Deputy Herrera intentionally made her feel unsafe in her own home.  Defendants sadistically implied that Perry would be severely harmed or killed if he didn't turn himself in, causing Robin sheer terror.  Defendants even trespassed into Robin's backyard and were caught peeping through her special needs son's window.  Defendants intentionally made Robin feel that she had to give up Perry to save her other son.

171.   DOE Deputies also forced Robin to give up the location of Perry even though she was going to have him peacefully surrender.  DOE Deputies intentionally lied to Robin so that they could encounter Perry in the field and use force, as threatened by Deputy Herrera.  And they did.

172.   This conduct was outrageous and sadistic.  These actions were done for the sole purpose of causing severe harm, distress, injury, fear, and pain, or at the very least, was done in reckless disregard of that probability.

173.   The same is true for all DOE Staff that encountered or evaluated Perry after April 2, 2018, because each DOE Defendant intentionally ignored Perry's mottling and toxic-appearing skin.  They also ignored Perry's weakness, body chill, vomiting, and semi-unconscious state.  DOE SBC Staff knows their conduct shocks the conscience because they tried to hide Perry's true medical state when transferring him to Arrowhead by fraudulently altering Perry's vital signs.

/ / /

35

COMPLAINT                                              CASE NO.

174.   The aforementioned acts and/or omissions of the Doe Staff was oppressive, malicious, and in conscious disregard of Plaintiffs life and liberty, thereby entitling them to an award of exemplary and punitive damages according to proof at trial.

## XII.

## EIGHTH CAUSE OF ACTION

### Battery

### [By Perry Against Deputy Herrera and DOE Deputies 1-20]

175.   Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

176.   By committing the acts described above in regards to unreasonable force used on Perry on several different occasions, each was done without consent or justification when Perry was either asking for medical help, restrained or complaint.

177.   As a result of this conduct, Plaintiff suffered the injuries and damages described in paragraphs and above and severe pain, suffering, and emotional distress, entitling him to damages in an amount to be proven at trial.

178.   In committing the acts alleged above, Defendants acted maliciously and/or were guilty of a wanton and reckless disregard for the rights and feelings of Perry and by reason thereof he is entitled to exemplary and punitive damages in an amount to be proven at trial.

## XI.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgement against Defendants, for each and every cause of action, as follows:

1.   For compensatory, general and special damages against each defendant, jointly and severally, in an amount according to proof;

/ / /

36

COMPLAINT                                          CASE NO.

2.      For punitive and exemplary damages against each individually named defendant in their individual capacity in an amount appropriate to punish defendants and deter others from engaging in similar misconduct;

3.      For costs and reasonable attorney's fees pursuant to 42 U.S.C. section 1988, Civil Code section 52.1, and as otherwise authorized by statute or law;

4.      For any further relief that the Court may deem appropriate.

## X.

## <u>DEMAND FOR JURY TRIAL</u>

Demand is hereby made by Plaintiffs Perry Belden and Robin Olds for a jury trial.

Respectfully submitted,

**MORRIS LAW FIRM, APC**

Dated:  May 13, 2019       by:  _/s/ Danielle R. Pena_
                                          Danielle R. Pena, Esq.
                                          dpena@morrislawfirmapc.com
                                          Christopher S. Morris
                                          cmorris@morrislawfirmapc.com
                                          Sharon J. Brunner, Esq.
                                          James S. Terrell, Esq.
                                          Attorneys for Plaintiffs

COMPLAINT                                               CASE NO.

# EXHIBIT 1

MEDICAL REMEDIAL PLAN
SAN BERNARDINO COUNTY JAILS

## MEDICAL RECORDS

1. The Sheriff's Department ("Department") shall implement an adequate electronic health care record ("EHR") and shall use its best efforts to begin implementing the EHR by February 2016.
   a. <u>New inmates</u>: From and after the date the EHR "goes live," medical services for all new inmates, booked into and held in the County jails, will be documented only in the EHR.
   b. <u>Existing inmates</u>: With respect to inmates already housed in the jails as of the "go live" date, all new medical encounters will be reported and recorded in the EHR system. Based on an individualized assessment of clinical necessity, all or portions of the paper medical records for existing inmates will be scanned into the EHR, will be available electronically and will be searchable.

## INTAKE PROCESS

2. The Department shall undertake to hire sufficient nursing staff such that registered nurses, and not correctional staff, shall perform all medical intake screening and assessments for inmates directly booked into West Valley Detention Center ("WVDC") and Central Detention Center ("CDC") or upon transfer to either WVDC or CDC from a Type I jail.
   a. <u>Staffing</u>. The County has authorized funding for 14 new registered nurse positions to staff WVDC and CDC and is currently attempting to fill those positions. The Department has determined that, at current population and utilization levels, the new positions should be sufficient to permit all intake screening and assessments at WVDC and CDC to be performed by nursing staff. Until the positions are filled, the Department will hire, and is hiring, contract nurses to staff the open positions. Because the County is having difficulty hiring full time staff to fill the available spots, the County is also currently reviewing its hiring procedures to determine if structural barriers to hiring exist in its hiring procedures and, if so, will make good faith efforts to overcome such barriers.
   b. <u>Type I jails</u>. The Department shall install the necessary hardware, software and equipment at Type I jails to provide videoconferencing capability ("telemedicine") so that clinical staff at Type II facilities can participate in the intake procedures at Type I jails. The County shall install the hardware, software and equipment by April 30, 2016, and will endeavor to have the telemedicine capability available for use by July 30, 2016. In the meantime, correctional staff

1

may continue to perform the intake screening and assessment at Type I jails. Upon transfer from a Type I facility to a Type II facility, inmates will receive intake screening performed by a nurse.

c. Intake screening questionnaire. The existing intake screening questionnaire conforms to National Commission on Correctional Health Care ("NCCHC") standard E-02 ("Receiving Screening"). The questionnaire shall be expanded to conform to NCCHC standard E-03 ("Transfer Screening") and E-04 ("Initial Health Assessment") and shall include specific questions regarding suicide risk factors, withdrawal risk factors, tuberculosis symptoms, a detailed mental health history, a mental status exam and a physical exam and shall conclude with the disposition status on allergies, medical follow-up, chronic disease enrollment, tuberculosis screening plan, withdrawal management and ADA issues. The EHR is anticipated to comply with this provision of the plan.

d. Conditions of arrest. The intake screening process shall continue to include questions directed to the arresting officer about the circumstances of arrest, including any force utilized and the officer's observations of the condition of the inmate. The EHR is anticipated to comply with this provision of the plan.

e. Vital signs. During the intake process, staff shall complete a full set of vital signs, including admission weight and obtain a medical history from the inmate/patient and verify and appropriately document the current medications and dosages from a reliable source. The EHR is anticipated to comply with this provision of the plan.

f. Tuberculosis screening. The Department shall implement a tuberculosis ("TB") screening protocol that conforms to the Centers for Disease Control guidelines on the prevention and control of tuberculosis in correctional facilities for all inmates booked into Type II jails. The Department may continue to perform symptom screening upon intake at Type I jails, provided that upon transfer from a Type I to a Type II jail, an inmate will be tested pursuant to the TB screening protocol. In the event an inmate is released before the test can be read, the inmate shall receive information directing him/her to have the test read at an appropriate medical facility.

g. Transfer between jails. When inmates are transferred from a Type I facility to a Type II facility the original receiving screening will be reviewed by the Intake RN who shall complete a comprehensive health assessment prior to housing the inmate at the Type II facility.

h. Implementation. The changes to the intake process described above are being and will continue to be implemented as increases in staffing permit. Full implementation, however, is dependent upon meeting clinical staffing goals,

2

installation of the kiosk system described below, and meaningful utilization of
the EHR. Full implementation shall be completed by February 2017.

3. Until July 1, 2017, when the currently planned Phase 2 staffing and buildout plan for
High Desert Detention Center ("HDDC") is to be completed, intake screenings and
assessments will continue to be performed by custody staff and/or nursing staff
(including contract nurses) as necessary. Upon completion of Phase 2, intake screenings
and assessments shall be performed only by a registered nurse.

4. Not later than July 1, 2016, the Department shall revise, and as revised, adopt and
implement its withdrawal assessment and treatment protocols to conform to NCCHC
standard J-G-06 ("Intoxication and Withdrawal") contemporary community standards,
including specific assessment protocols for alcohol, opiate and benzodiazepine
withdrawal and structured and scheduled nursing encounters for the sobering cell
process.

INFECTION CONTROL PROCESSES

5. The Department has reviewed and amended its policy regarding provision of soap and
personal grooming items to inmates so as to ensure, to the degree feasible, that
inmates have such items available to them at all times. In particular, as of December
2015, inmates receive two bars of "hotel size" soap from the commissary in their
"Welfare Bag."

6. As of December 2015, the Department has reviewed the number of waterless hand
sanitizer dispensers, and restrooms available to enable custody staff, healthcare staff
and visitors to sanitize their hands in all patient care areas, visiting areas and staff areas
and has determined there are adequate dispensers and facilities available. The
Department will ensure on an ongoing basis that the provided locations have the
necessary products for infection control.

7. The Department has amended its current Detentions and Corrections Manual Grooming
Equipment Policy No. 925.00 regarding the cleaning and disinfecting of grooming
equipment to comply with all applicable local, state and national requirements and
standards, and thereafter ensure continued compliance with the existing or amended
policy.

3

SICK CALL PROCESS/HEALTH CARE REQUESTS

8. The Department is implementing an electronic, kiosk system to permit inmates to make a variety of requests. The Department shall ensure that the kiosk system is configured to permit inmates to make non-urgent and non-emergent health services requests through the kiosk terminals, that the requests are sent electronically directly to health service personnel, that inmates shall have the ability to track electronically the status of their requests and that the health care request system complies with NCCHC standard J-A-01 ("Access to Care"). The Department will also provide signage and notices on the kiosk screens to explain to inmates how to make requests for urgent or emergent health care needs. Kiosk implementation shall occur by September 2016.

9. The Department shall ensure, at a minimum, continued compliance with Detentions and Corrections Health Services Division Operational Procedural Manual Policy No. 306, regarding the sick call process, as well as NCCHC standards J-E-07 (regarding non-emergency health services requests) and J-E-08 (regarding emergency services). NCCHC standard J-E-07 requires a face-to-face encounter with the inmate within 48 hours on weekdays and 72 hours on the weekend. Nevertheless, the Department will make good faith efforts to have inmate-patients see a clinician for a face-to-face encounter within 24 hours of a sick call request.

SPECIALITY CARE

10. The Department shall implement a comprehensive specialty clinic scheduling procedure with accountability for the entire Department. The EHR is anticipated to comply with this provision. That system shall require the following:

 a. Emergency consultations or procedures shall be provided immediately.

 b. Urgent consultations or procedures shall be scheduled to be provided in 14 days.

 c. Routine consultations or procedures shall be scheduled to be provided within 90 days.

 d. Develop and implement a tracking system that identifies and documents the specialty referral date, the date the referral was sent to the clinic, the date the appointment is confirmed, the date the appointment is completed, and, if the appointment is rescheduled or canceled, the reason therefor.

4

e. Specialty care documentation from an outside source shall be evaluated by a provider (MD, NP or PA) promptly upon the patient's return to the facility. Recommendations from the specialist shall be reviewed by the Chief Medical Officer and implemented as ordered. The provider shall make a clinical judgment about whether seeing the patient is necessary, and, if so, when.

DEATH REVIEW PROCESS

11. The Department is complying and will continue to comply with NCCHC standard J-A-10 ("Procedure In the Event of an Inmate Death") which provides that that all In-custody deaths are to be reviewed to determine the appropriateness of clinical care; to ascertain whether change to policies, procedures, or practices are warranted; and to identify issues that require further study. All deaths shall be reviewed within 30 days with the information then available and again when the Coroner's report is available. The death review shall consist of an administrative review, a clinical mortality review, and a psychological autopsy if death is by suicide and a written report shall be prepared. Corrective actions identified through the mortality review process shall be implemented and monitored through the facility's CQI program for systemic issues, and through the staff education program for staff related issues.

NURSING CULTURE

12. Clinical staff shall be issued, and be required to wear, identification tags that indicate their licensure (e.g., RN, MD), their first name and last initial.

CONTINUOUS QUALITY IMPROVEMENT

13. The Department shall continue to bring its Continuous Quality Improvement ("CQI") process into compliance with NCCHC Standard J-A-06 ("Continuous Quality Improvement") and to ensure that its CQI process meets such standard. In or about January or February 2016, the Department shall request funding for a single SRN II position to oversee the CQI program, expects that the position will be funded by September 1, 2016. Staffing and full implementation will occur by December 2016.

DIAGNOSTICS

14. The Department operates a number of specialty clinics at WVDC. The Department will continue to consider new technologies and methodologies in the event that it may become appropriate to establish an on on-site diagnostics laboratory to complement the existing clinics.

5

15. As of January 1, 2016, the Department has developed and is implementing a policy to ensure that all laboratory results are returned to the provider within a clinically appropriate time.

REPORTING

16. The Department will provide to Plaintiffs' counsel a Remedial Plan Compliance Update every three months during the first year of this plan and every six months thereafter until full compliance is achieved.  The Update will specifically identify any items the Department anticipates will not meet the deadlines set forth in this Remedial Plan and will provide alternate deadlines.

# EXHIBIT B

EXHIBIT A: SCHEDULE OF PRETRIAL AND TRIAL DATES

CASE NAME: GEORGE TOPETE , et al. v. COUNTY OF SAN BERNARDINO

CASE NO.: 5:16–cv–00355–VAP–DTB

| Matter | Plaintiff(s) Request | Defendant(s) Request | Court's Order |
|---|---|---|---|
| Trial Date (**Tuesday**) Jury ☐; Court ☐; Length: ___ Days | TBD | TBD | |
| Pretrial Conf., L.R. 16; Hearing on Motions in Limine | TBD | TBD | |
| Last day to conduct Settlement Conf., L.R. 16–15 | TBD | TBD | |
| Last day for **hearing** non–discovery motions | TBD | TBD | |
| All Discovery Cutoff, including hearing all discovery motions | TBD | TBD | |
| Expert Disclosure (rebuttal) | TBD | TBD | |
| Expert Disclosure (initial) | TBD | TBD | |
| Last day to amend pleadings or add parties | TBD | TBD | |
| Last day for filing motion for class certification (if applicable) | 8/15/16 | 8/15/16 | |
| Hearing on motion for class certification (if applicable) | 9/12/16 | 9/12/16 | |

LOCAL RULE 16–15 Settlement Choice:

☐ U.S. Magistrate Judge (#1)

☐ Attorney Settlement Officer Panel (#2)

☒ Outside ADR (#3)

# EXHIBIT 2

1  DONALD SPECTER (83925)
   dspecter@prisonlaw.com
2  MARGOT MENDELSON (268583)
   mmendelson@prisonlaw.com
3  PRISON LAW OFFICE
   1917 Fifth Street
4  Berkeley, California 94710
   Telephone: (510) 280-2621
5  Facsimile: (510) 280-2704

6  *Attorneys for Plaintiffs*
   *On behalf of themselves and others*
7  *similarly situated*

MARTIN H. DODD (104363)
mdodd@fddcm.com
JAMIE L. DUPREE (158105)
jdupree@fddcm.com
JAIME G. TOUCHSTONE (233187)
jtouchstone@fddcm.com
FUTTERMAN DUPREE DODD CROLEY
MAIER LLP
601 Montgomery St., Suite 333
San Francisco, California 94111
Telephone: (415) 399-3840
Facsimile: (415) 399-3838

In Association with:
MILES KOWALSKI, Deputy County
Counsel (257269)
Miles.Kowalski@cc.sbcounty.gov
MICHELLE BLAKEMORE, County
Counsel (110474)
385 North Arrowhead Avenue, 4th Fl.
San Bernardino, CA 92415-0140
Telephone: (909) 387-5455
Facsimile: (909) 387-3070

*Attorneys for Defendant*
*San Bernardino County*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION - RIVERSIDE

| | |
|---|---|
| RAHSHUN TURNER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN BERNARDINO,<br><br>Defendant. | Case No.  5:16-CV-00355-VAP (DTBx)<br><br>**[PROPOSED] CONSENT DECREE**<br><br><br>**District Court Judge Virginia A. Phillips**<br>**Magistrate Judge David T. Bristow** |

## A.  Introduction

1.    The parties to this Consent Decree are Plaintiffs Rahshun Turner, Monique Lewis, Jaime Jaramillo, Joshua Mills and the class and subclasses of inmates they represent (collectively, "Plaintiffs"), on the one hand, and Defendant

1

1    County of San Bernardino ("Defendant"), on the other hand. The parties enter into

2    this Consent Decree to ensure the provision of constitutional medical, dental and

3    mental health care, to ensure non-discrimination for inmates with disabilities and

4    to address uses of force and restrictive housing in the San Bernardino County

5    Jails.[1]

6         2.    Plaintiffs filed this Action on February 29, 2016 and filed a Second

7    Amended Complaint on November 18, 2016. The Action alleges that Defendant

8    fails to provide minimally adequate medical, dental and mental health care to the

9    people incarcerated in its jails, fails to prevent unnecessary and excessive uses of

10   force against inmates and imposes on inmates the harmful and excessive use of

11   solitary confinement in violation of the Eighth and Fourteenth Amendments to the

12   United Constitution, as well as discrimination against certain inmates with

13   disabilities in violation of the Americans with Disabilities Act and Section 504 of

14   the Rehabilitation Act. Defendant has denied liability. On January 27, 2017, the

15   Court granted the parties' joint motion for class certification.

16        3.    The Plaintiff class consists of "all people who are now, or in the

17   future will be, incarcerated in the San Bernardino County jails" and a subclass of

18   "all people who are now, or in the future will be, incarcerated in the San

19   Bernardino County jails and who have a psychiatric and/or intellectual disability,

20   as defined under the Americans with Disabilities Act, 42 U.S.C. §12101 et seq.,

21   and Section 504 of the Rehabilitation Act, 29 U.S.C. §794."

22   ///

23   _____

24   [1] For the purposes of this Consent Decree, references to the San Bernardino Jails
     include the Type I and II jails as well as the Arrowhead Regional Medical Center,
25   to the extent it houses inmates under the jurisdiction of the San Bernardino County
     Sheriff, and any new structures designated to house prisoners under the
26   jurisdiction of the San Bernardino County Sheriff subsequent to the date of this
     Consent Decree. The parties acknowledge that, because Type I jails are very
27   short-term holding facilities, certain provisions of Remedial Plan attached hereto
     as Exhibit A will apply only to Type II jails at which inmates are housed for longer
28   periods of time.

FUTTERMAN DUPREE
DODD CROLEY
MAIER LLP

2

[PROPOSED] CONSENT DECREE
CASE NO. 5:16-CV-00355 VAP (DTBx)

4.     Commencing in January 2015, prior to the initiation of this Action, the parties undertook settlement negotiations to address Plaintiffs' claims and those negotiations have continued. To aid in settlement negotiations, the parties agreed to hire neutral experts to investigate and opine on the adequacy of medical and mental health care delivered in the San Bernardino jails, as well as the extent and propriety of uses of force against inmates incarcerated by Defendant. The parties jointly selected Todd Wilcox, M.D., as the expert on medical care; Roberta Stellman, M.D., as the expert on mental health care; and Jeffrey Schwartz, Ph.D., and Gary Raney, former Sheriff of Boise County, Idaho, as experts with regard to use of force in the jails.

5.     The experts conducted extensive tours and reviews of the jail facilities, policies and procedures and interviewed staff and inmates. They drafted preliminary reports setting forth their findings and recommendations, and both parties were given the opportunity to review the reports and make comments. The experts thereafter submitted their final reports setting forth their respective findings and making recommendations for remedial action.

6.     With respect to dental care in the jails, alleged discrimination against inmates with disabilities and policies governing restrictive housing in the jails, the parties engaged in direct discussions without benefit or need of joint experts or expert reports or findings.

7.     The parties thereafter negotiated individual remedial plans pertaining to the matters alleged in the Action and those individual plans have been incorporated into a single, global Remedial Plan, attached hereto as Exhibit A.

8.     Each party to this Consent Decree was represented by counsel during its negotiation and execution. Plaintiffs and the Plaintiff classes and subclasses are represented by Donald Specter, Margot Mendelson and Sara Norman, Prison Law Office.  Defendant is represented by Martin H. Dodd, Futterman Dupree Dodd Croley Maier, LLP, and Miles Kowalski, Deputy County Counsel for the County

1 | of San Bernardino.

2 |     9.    Through this Consent Decree, Defendant agrees to implement the
3 | measures set forth in the Remedial Plan, subject to monitoring by the Court
4 | experts and Plaintiffs' counsel, negotiation between the parties, and if necessary,
5 | enforcement by the Court.

6 | **B.    Remedial Plan**

7 |     10.    Defendant shall fully implement all of the remedial measures,
8 | according to the specified timeframes, set forth in the Remedial Plan. The
9 | Remedial Plan is designed to meet the minimum level of health care necessary to
10 | fulfill Defendant's obligations under the Eighth and Fourteenth Amendments, to
11 | ensure that unlawful force is not utilized in the jails, to avoid the unlawful use of
12 | segregated or restrictive housing in the jails and to ensure compliance with the
13 | ADA and Section 504 of the Rehabilitation Act.

14 |     11.    Defendant shall, in consultation and collaboration with Plaintiffs'
15 | counsel, develop and implement appropriate and adequate plans, policies, and
16 | practices to ensure compliance with the Remedial Plan. At least 30 days prior to
17 | finalizing or implementing any new plans or policies developed to meet the terms
18 | of the Remedial Plan, Defendant will submit such plans or policies to Plaintiffs'
19 | counsel for their review and comments. Disagreements about the adequacy of such
20 | plans or policies shall be resolved pursuant to the dispute resolution procedure set
21 | forth paragraphs 28-31, below.

22 |     12.    Not less than 90 days, and not more than 120 days, after this Consent
23 | Decree is approved by the Court, Defendant shall provide to Plaintiffs' counsel
24 | and the Court experts a Status Report stating whether it is complying with the
25 | terms of this Consent Decree. The Status Report shall include a description of the
26 | steps that Defendant has taken to implement the Remedial Plan. Not later than the
27 | end of each subsequent 120-day period during the term of this Consent Decree,
28 | Defendant shall provide to Plaintiffs' counsel and the Court experts a Status

FUTTERMAN DUPREE
DODD CROLEY
MAIER LLP

4

[PROPOSED] CONSENT DECREE
CASE NO. 5:16-CV-00355 VAP (DTBx)

Report addressing each item of the Remedial Plan and shall specify whether it believes it is or is not in substantial compliance with each material component of the Remedial Plan.[2]

## C.    Court Experts

13.    Pursuant to Rule 706 of the Federal Rules of Evidence, the parties jointly request the appointment of Todd Wilcox, M.D., Roberta Stellman, M.D., and Jeffrey Schwartz, Ph.D. and Gary Raney, as Court experts to advise the Court on the County's compliance or non-compliance with the medical care, mental health care and use of force provisions, respectively, of the Remedial Plan, to assist with dispute resolution matters addressed in paragraphs 28-31, and to provide testimony, if required, in any proceedings before the Court.

14.    Within 180 days after entry of this Consent Decree, and then every 180 days thereafter during the term of this Consent Decree, the Court experts shall each complete comprehensive reviews and reports ("180-Day Reports") to advise the parties and the Court on Defendant's compliance or non-compliance with the Remedial Plan.

15.    In each 180-Day Report the experts shall state their opinion as to whether Defendant is or is not in substantial compliance with each material component of the Remedial Plan within the expert's area of expertise. These opinions are hereinafter referred to as "Substantial Compliance Determinations." The 180-Day Reports shall be considered separate and apart from any evaluations and reports prepared as part of the dispute resolution process described below and shall be admissible in evidence in any proceedings before the Court.

16.    The experts' duties specified in Exhibit B shall be provided to the experts pursuant to Rule 706(b). The Court experts shall be entitled to reasonable compensation in an amount approved by the Court, which shall be paid by

---

[2] For purposes of this Consent Decree a "material component" of the Remedial Plan shall be any of the subparts of the Remedial Plan identified by a capital letter (e.g., "**D.  Medical Records**").

1  Defendant.

2       17.     With appropriate notice, the Court experts shall have reasonable
3  access to all parts of any San Bernardino Jail and access to the facilities will not be
4  unreasonably restricted.  The experts shall have access to correctional and health
5  care staff and inmates, including confidential and voluntary interviews as they
6  deem appropriate. The experts shall also have access to documents, including
7  budgetary, custody, and health care documents, and institutional meetings,
8  proceedings, and programs to the extent the experts determine such access is
9  needed to fulfill their obligations. The experts' tours shall be undertaken in a
10  manner that does not unreasonably interfere with jail operations as reasonably
11  determined by jail administrators.

12       18.     The parties agree that they are each entitled to engage in ex parte
13  communications with the Court experts. However, all of the experts' findings and
14  recommendations shall be set forth in writing in their reports.

15       19.     If, for any reason, a designated Court expert can no longer serve or
16  the parties wish to engage any additional expert(s), the parties shall attempt to
17  agree on who shall be appointed to serve as a new or additional expert.  If the
18  parties are unable to agree, Defendant and Plaintiffs shall each nominate and
19  submit two potential experts for the Court's consideration and selection.

20  **D.**    **Notice to Class Members**

21       20.     Defendant shall post notices to class members of this Action in a
22  manner agreed upon by the parties.  Such notices shall include a brief statement
23  that includes a description of Plaintiffs' claims, the definition of the classes and
24  subclasses, notice that the parties have entered into this Consent Decree, a
25  description of the subject areas covered by the Consent Decree and Remedial Plan,
26  and the contact information for the Prison Law Office to allow inmates to contact
27  Plaintiffs' counsel.

28  ///

FUTTERMAN DUPREE
DODD CROLEY
MAIER LLP

6

53

**E.     Plaintiffs' Monitoring and Access to Information**

21.     Plaintiffs shall be permitted to monitor Defendant's compliance with the Remedial Plan. Defendant shall provide Plaintiffs with access to all such San Bernardino Jail facilities, documents, records, and staff that Plaintiffs believe in good faith is necessary to monitor Defendant's compliance with the Remedial Plan subject, where applicable, to the protective order agreed upon by the parties, entered by the Court on October 18, 2016, and attached hereto as Exhibit C. Plaintiffs shall not be entitled to personnel records, including records and information deemed confidential pursuant to California Penal Code § 832.7. From and after the date this Consent Decree is entered by the Court, Defendant shall provide Plaintiffs with access to such information within 21 calendar days of their request. If Defendant believes that the information requested by Plaintiffs is not necessary to monitor compliance with the Remedial Plan, the parties shall engage in the dispute resolution process described in paragraphs 28-31, below, before seeking any relief from the Court.

22.     In each of the first two years following the date on which this Consent Decree is entered, Plaintiffs and their consultants shall be permitted the opportunity to conduct three tours of the San Bernardino Jails for the purpose of monitoring compliance with the Remedial Plan. Thereafter, Plaintiffs shall have the opportunity to conduct up to two tours of the jails per year, provided however, that Plaintiffs may bring a motion seeking authorization from the Court to conduct a third monitoring tour in any given year. Before bringing such a motion, Plaintiffs shall have complied with the dispute resolution process described in Paragraphs 28-31, below. Unless otherwise agreed by the parties or ordered by the Court, monitoring tours by Plaintiffs and/or their consultants shall be separated by a period of no less than 90 days.

23.     Monitoring tours shall include reasonable access to all of the jail facilities, including all housing units, facilities where health care services are

1 provided, facilities where inmates with disabilities are or may be housed and
2 provided programming, and any other facilities where services are provided
3 pursuant to the Remedial Plan. During the tours, Defendant shall make available
4 for interview any supervisory, clinical, custodial, and program staff that have
5 direct or supervisory responsibility for health care and disability accommodations.
6 Defendant shall provide a Sheriff's Department contact person to ensure
7 cooperation of institution staff with Plaintiffs in obtaining information they
8 request during the tours. During the tours, Defendant shall permit and facilitate
9 Plaintiffs having confidential and voluntary discussions with any inmate identified
10 by Plaintiffs. Upon request by Plaintiffs and pursuant to the protective order
11 entered in this case, Defendant shall make available for inspection and/or copying
12 the health care and/or custody files of specified inmates. Disputes that may arise
13 over Plaintiffs' access to jail information or personnel shall be addressed in the
14 first instance by the dispute resolution process set forth in Paragraphs 28-31,
15 below, before the parties may seek relief from the Court.

16    24.    If Plaintiffs form the good faith belief that Defendant is not
17 substantially compliant with any material component of the Remedial Plan then
18 subject to monitoring, Plaintiffs shall so inform Defendant and any relevant Court
19 expert of the alleged noncompliance and identify the material component of the
20 Remedial Plan alleged to be noncompliant.

21    Defendant shall investigate the alleged noncompliance and provide
22 Plaintiffs with a response in writing within 30 calendar days, provided however,
23 that if the notice from Plaintiffs is provided to Defendant (i) less than 45 days
24 before the next anticipated Status Report, then Defendant may elect to include its
25 response in the next Status Report; or (ii) less than 45 days before the next
26 anticipated 180-Day Report from a relevant Court expert, Defendant may elect to
27 defer responding until the expert has made a Substantial Compliance
28 Determination applicable to the material component of the Remedial Plan alleged

1 | to be noncompliant.

2 | 25. Plaintiffs' counsel retain the ability to interview their clients pursuant
3 | to regular attorney-client visiting procedures established by the Sheriff's
4 | Department. The parties will attempt to establish an efficient means to allow
5 | Plaintiffs' counsel to interview clients and conduct confidential telephonic
6 | interviews with individual inmates, with reasonable notice, in a manner that does
7 | not disrupt jail operations.

8 | 26. Plaintiffs' counsel shall be allowed to send postage pre-paid
9 | envelopes to their clients in the San Bernardino Jails.

10 | **F.    Individual Advocacy**

11 | 27. Plaintiffs may bring individual inmates' health care, use of force,
12 | restricted housing or disability accommodation concerns to the attention of
13 | Defendant's counsel, or their designee, who shall respond in writing within 14
14 | days. This process is not meant to replace or circumvent the existing processes for
15 | requesting medical or mental health services or submitting grievances to jail
16 | authorities. Inmates will be encouraged to make use of those processes except
17 | where exigent circumstances or failures of those processes have occurred.

18 | **G.    Dispute Resolution**

19 | 28. Either party may initiate the dispute resolution process with respect to
20 | a matter covered by this Consent Decree by providing written notice of a dispute
21 | ("Dispute Notice") to the other party and to mediator Debra Mellinkoff or such
22 | other mediator as the parties may have selected ("Mediator"). The Dispute Notice
23 | shall request that the Mediator schedule a date for mediation that is not less than
24 | 90, and not more than 120, days after the Dispute Notice.

25 | 29. Following service of the Dispute Notice, the parties shall undertake
26 | good faith negotiations at such times and places as they deem sufficient in an
27 | effort to resolve the dispute informally between them. If, within 30 days after
28 | service of the Dispute Notice, the parties have failed to resolve the dispute, either

1  party may request that the relevant Court expert evaluate the issue in dispute and

2  prepare a report. The expert must provide the report regarding the area of

3  disagreement to the parties and the Mediator within 45 days of the request.

4  Defendant will pay the experts' reasonable fees for any reports prepared by a

5  Court expert at the request of a party about a disputed issue, as contemplated by

6  this paragraph.

7      30.    If the parties are unable to resolve the dispute informally, they shall

8  attempt to resolve the dispute through the scheduled mediation before the

9  Mediator.  The parties and the Mediator shall conduct the mediation at such place

10 and in such manner as they shall have agreed upon.

11     31.    Mediation shall be deemed to have concluded with respect to an issue

12 in dispute if i) the parties agree in writing that mediation is concluded; or ii) upon

13 the request of a party, the Mediator determines and so notifies the parties in

14 writing that the parties are at impasse, a party is not negotiating in good faith or

15 further negotiation would be futile.

16     32.    With the exception of any report prepared by a Court expert, as

17 contemplated by Paragraph 29, above, and any notice that mediation is concluded,

18 nothing said and no document prepared in connection with the mediation shall be

19 offered in evidence in any subsequent judicial proceeding in this case.

20 **H.    Enforcement**

21     33.    The Court shall retain jurisdiction to enforce the terms of this Consent

22 Decree and shall have the power to enforce the agreement through specific

23 performance and all other remedies permitted by law until Defendant fulfills its

24 obligations under this Consent Decree.

25 **I.    Duration and Termination**

26     34.    This Consent Decree shall remain in effect for four years from the

27 date it is entered by the Court, unless it is earlier terminated pursuant to Paragraph

28 35, below.

FUTTERMAN DUPREE
DODD CROLEY
MAIER LLP

10

[PROPOSED] CONSENT DECREE
CASE NO. 5:16-CV-00355 VAP (DTBx)

35.     Defendant may seek termination of this Consent Decree by bringing a termination motion pursuant to 18 U.S.C. § 3626(b)(1)(A)(i), provided however, that (i) Defendant shall not bring any such motion for a period of two years from the date this Consent Decree is entered by the Court; (ii)  any termination motion shall be based on a record of no less than one year of substantial compliance with all the requirements of this Consent Decree and the Remedial Plan; and, (iii) prior to bringing such a motion, Defendant shall have complied with the dispute resolution process described in Paragraphs 28-31, above.

36.     Defendant may request a finding by the Court that it is in substantial compliance with one or more material components of the Remedial Plan and shall base such request on evidence that it has maintained such substantial compliance for a period of at least twelve months, provided that, before requesting such a finding, Defendant shall have complied with the dispute resolution process described in Paragraphs 28-31, above.  Unless otherwise ordered by the Court, such a finding shall result in a suspension of monitoring of any such material component(s) by the relevant Court expert and Plaintiffs.

37.     If Plaintiffs form the good faith belief that Defendant is no longer in substantial compliance with any material component(s) of the Remedial Plan previously found to be in substantial compliance and as to which monitoring has been suspended, Plaintiffs shall promptly so notify Defendant in writing and present a summary of the evidence upon which such belief is based.  Within 30 days thereafter, Defendant shall serve a written response stating whether it agrees or disagrees that it is no longer in substantial compliance with respect to that material component of the Remedial Plan.  In the event that Defendant agrees, monitoring by the Court experts and Plaintiffs pursuant to this Consent Decree shall resume.  In the event Defendant disagrees, Plaintiffs may bring a motion before the Court seeking such relief as may be appropriate, including but not limited to reinstating full monitoring, provided that, before bringing such a

1   motion, Plaintiffs shall have complied with the dispute resolution process

2   described in Paragraphs 28-31, above.

3   **J.**     **Costs and Fees**

4         38.    The parties agree that, by entry of this Consent Decree, Plaintiffs

5   shall be considered the prevailing party in this litigation. The Prison Litigation

6   Reform Act ("PLRA"), 42 U.S.C. § 1997e, would limit the hourly rates at which

7   Plaintiffs' counsel can be compensated in connection with certain claims in the

8   Action, while other claims are not subject to such statutory limits.

9   Notwithstanding the foregoing, subject to Court approval, the Parties have reached

10   a compromise and Defendant has agreed to pay Plaintiffs' counsel $350,000 as

11   their reasonable fees and expenses incurred from the date of filing of the

12   Complaint in this Action through Final Approval of the Consent Decree, including

13   approval of the Remedial Plan pursuant to the following rates: $420 per hour for

14   attorneys and $200 per hour for paralegals.

15         39.    Plaintiffs shall be compensated for their reasonable time and

16   reasonable expenses (including the costs of any consultants Plaintiffs may retain)

17   relating to monitoring this Consent Decree and Remedial Plan, including any time

18   and expenses incurred in connection with the resolution of any dispute pertaining

19   to such monitoring.   Subject to both Court approval and Defendant's right to

20   object either to the payment of all or any portion of the fees or to the

21   reasonableness of the number of hours for which Plaintiffs may seek

22   compensation, and notwithstanding the rates that Plaintiffs potentially could

23   request or would be limited to in any proceedings before the Court, the parties

24   have agreed that Plaintiffs' counsel shall be compensated for monitoring services

25   at the following rates: $420 per hour for attorneys and $200 per hour for

26   paralegals.   Plaintiffs shall submit a detailed invoice for their fees and expenses

27   (including the date, amount of time spent, and a general description of each task)

28   at the end of every quarter and Defendant shall pay the amount requested by

FUTTERMAN DUPREE
DODD CROLEY
MAIER LLP

12

1   Plaintiffs within 60 calendar days of receipt of each invoice, *provided* that

2   Plaintiffs' fees and expenses shall be capped at $150,000 per calendar year. Two

3   years after the approval of this Consent Decree Plaintiffs may request that the

4   yearly cap on fees and expenses should be increased. That request shall be subject

5   to the dispute resolution process set forth in paragraphs 30 and 31, and, if

6   necessary, resolution by the Court. The yearly cap on fees and expenses described

7   in the previous sentence shall not apply to any fees and costs that Plaintiffs may

8   incur in enforcing or defending the Consent Decree and the Remedial Plan in

9   court.

10   **K.**   **Effect of Consent Decree in Other Actions.**

11       40.   Neither the fact of this Consent Decree nor any statement of claims

12   contained herein shall be used in any other case, claim, or administrative

13   proceedings, except that Defendant and its employees and agents may use this

14   Consent Decree and any statement contained herein to assert issue preclusion or

15   *res judicata.*

16       41.   Nothing in this Consent Decree is intended to modify, revise or

17   change any existing court orders or decrees applicable to Defendant or to

18   operations at or inmates housed in the San Bernardino County Jails including, but

19   not limited to, any orders and decrees in *Haas et al. v. Board of Supervisors of San*

20   *Bernardino County et al.*, San Bernardino Superior Court No. WHC 4010.

21   **L.**   **Liability and Necessity for Relief**

22       42.   Defendant admits for the purpose of this lawsuit only that there exists

23   probable cause to believe that violations of the federal rights of plaintiffs have

24   occurred sufficient to warrant the relief contained herein. The parties agree that the

25   relief contained herein is narrowly drawn, extends no further than necessary to

26   ensure the protection of the federal constitutional and statutory rights of Plaintiffs,

27   and is the least intrusive means necessary to accomplish those objectives.

28   ///

1 **IT IS SO AGREED AND STIPULATED.**

2                                                    Respectfully submitted,

3

4 Dated:  March 29, 2018                    PRISON LAW OFFICE

5                                                    By: /s/ Donald Specter
                                                           Donald Specter
6                                                       Margot Mendelson
                                                           Sara Norman
7                                                    *Attorneys for Plaintiffs, on behalf of*
8                                                    *themselves and others similarly*
                                                     *situated*
9

10 Dated:  March 29, 2018                   FUTTERMAN DUPREE DODD
11                                                   CROLEY MAIER LLP

12                                                   By: /s/ Martin H. Dodd
                                                           Martin H. Dodd
13                                                   *Attorneys for Defendant*
                                                     *San Bernardino County*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **ORDER**

The Court, having considered the foregoing stipulated Consent Decree, hereby approves and adopts the Consent Decree as the Order of the Court and, in so doing, finds that the relief contained herein is narrowly drawn, extends no further than necessary to ensure the protection of the federal constitutional and statutory rights of Plaintiffs, and is the least intrusive means necessary to accomplish those objectives.

The Court specifically authorizes the appointment, pursuant to FRE 706(b), of Todd Wilcox, M.D., Roberta Stellman, M.D., and Jeffrey Schwartz, Ph.D. and Gary Raney, as Court experts to advise the Court on the County's compliance or non-compliance with the medical care, mental health care and use of force provisions, respectively, of the Remedial Plan, to assist with dispute resolution matters as prescribed in the Consent Decree, and to provide testimony, if required, in any proceedings before the Court. Subject to the approval of the Court, the Court experts shall be entitled to reasonable compensation at the rates set forth in Exhibit B to the Consent Decree and to reimbursement for reasonable expenses incurred in connection with their duties, which shall be paid by Defendant.

Dated: _____, 2018

_____
Honorable Virginia A. Phillips
United States District Judge

Case 5:19-cv-00955-RGK-KK Document 1 Filed 05/13/19 Page 63 of 113 Page ID #:63
Case 5:16-cv-00955-VAP-JCB Document 81-2 Filed 03/28/18 Page 17 of 93 Page ID
#:761

# EXHIBIT A

# REMEDIAL PLAN
## SAN BERNARDINO COUNTY JAILS

## I.    MEDICAL CARE

### A.    Medical Records

The San Bernardino County Sheriff's Department ("SBCSD") shall implement an adequate electronic health care record ("EHR") and shall use its best efforts to begin implementing the EHR by February 2016.

    i.    New inmates. From and after the date the EHR "goes live," medical services for all new inmates, booked into and held in the County jails, will be documented only in the EHR.

    ii.    Existing inmates. With respect to inmates already housed in the jails as of the "go live" date, all new medical encounters will be reported and recorded in the EHR system. Based on an individualized assessment of clinical necessity, all or portions of the paper medical records for existing inmates will be scanned into the EHR, will be available electronically and will be searchable.

### B.    Intake Process

SBCSD shall undertake to hire sufficient nursing staff such that registered nurses, and not correctional staff, shall perform all medical intake screening and assessments for inmates directly booked into West Valley Detention Center ("WVDC") and Central Detention Center ("CDC") or upon transfer to either WVDC or CDC from a Type I jail.

    i.    Staffing. The County has authorized funding for 14 new registered nurse positions to staff WVDC and CDC and, within 60 days after this Remedial Plan is approved by the Court, shall hire staff to fill those positions. SBCSD has determined that, at current population and utilization levels, the new positions should be sufficient to permit all intake screening and assessments at WVDC and CDC to be performed by nursing staff. Until the positions are filled, SBCSD will hire, and is hiring, contract nurses to staff the open positions. Because the County is having difficulty hiring full time staff to fill the available spots, the County shall review its hiring procedures to determine if structural barriers to hiring exist in its hiring procedures and, if so, will make good faith efforts to overcome such barriers.

    ii.    Type I Jails. SBCSD shall install the necessary hardware, software and equipment at Type I jails to provide videoconferencing capability ("telemedicine") so that clinical staff at Type II facilities can participate in the intake procedures at Type I jails. The County has installed the hardware, software and equipment for telemedicine capability. Within 60 days after approval of this Remedial Plan by the Court, intake screening and assessment at Type I facilities shall be conducted by clinical staff and may be accomplished utilizing the telemedicine capability. Upon transfer from a Type I facility to a Type II facility, inmates will receive intake screening performed by a nurse.

1

iii.    Intake screening questionnaire. The existing intake screening questionnaire conforms to National Commission on Correctional Health Care ("NCCHC") standard E-02 ("Receiving Screening"). The questionnaire shall be expanded to conform to NCCHC standard E-03 ("Transfer Screening") and E-04 ("Initial Health Assessment") and shall include specific questions regarding suicide risk factors, withdrawal risk factors, tuberculosis symptoms, a detailed mental health history, a mental status exam and a physical exam and shall conclude with the disposition status on allergies, medical follow-up, chronic disease enrollment, tuberculosis screening plan, withdrawal management and ADA issues. The EHR is anticipated to comply with this provision of the plan.

iv.    Conditions of arrest. The intake screening process shall continue to include questions directed to the arresting officer about the circumstances of arrest, including any force utilized and the officer's observations of the condition of the inmate. The EHR is anticipated to comply with this provision of the plan.

v.    Vital signs. During the intake process, staff shall complete a full set of vital signs, including admission weight and obtain a medical history from the inmate/patient and verify and appropriately document the current medications and dosages from a reliable source. The EHR is anticipated to comply with this provision of the plan.

vi.    Tuberculosis screening. SBCSD shall implement a tuberculosis ("TB") screening protocol that conforms to the Centers for Disease Control guidelines on the prevention and control of tuberculosis in correctional facilities for all inmates booked into Type II jails. SBCSD may continue to perform symptom screening upon intake at Type I jails, provided that upon transfer from a Type I to a Type II jail, an inmate will be tested pursuant to the TB screening protocol. In the event an inmate is released before the test can be read, the inmate shall receive information directing him/her to have the test read at an appropriate medical facility.

vii.    Transfer between jails. When inmates are transferred from a Type I facility to a Type II facility the original receiving screening will be reviewed by the Intake RN who shall complete a comprehensive health assessment prior to housing the inmate at the Type II facility.

viii.    Implementation. The changes to the intake process described above are being and will continue to be implemented as increases in staffing permit. Full implementation, however, will not be considered complete until the County has met clinical staffing goals, the kiosk system described below is installed and is fully operational, and meaningful utilization of the EHR has commenced.

ix.    Intake at High Desert Detention Center ("HDDC"). Within 60 days after approval of this Remedial Plan by the Court, intake screenings and assessments at HDDC shall be conducted by registered nursing staff.

x.    SBCSD has revised and adopted and is implementing its withdrawal

2

assessment and treatment protocols to conform to NCCHC standard J-G-06 ("Intoxication and Withdrawal") contemporary community standards, including specific assessment protocols for alcohol, opiate and benzodiazepine withdrawal and structured and scheduled nursing encounters for the sobering cell process.

### C. Infection Control Processes

i.     SBCSD has reviewed and amended its policy regarding provision of soap and personal grooming items to inmates so as to ensure, to the degree feasible, that inmates have such items available to them at all times. In particular, as of December 2015, inmates receive two bars of "hotel size" soap from the commissary in their "Welfare Bag."

ii.     As of December 2015, SBCSD has reviewed the number of waterless hand sanitizer dispensers, and restrooms available to enable custody staff, healthcare staff and visitors to sanitize their hands in all patient care areas, visiting areas and staff areas and has determined there are adequate dispensers and facilities available. SBCSD will ensure on an ongoing basis that the provided locations have the necessary products for infection control.

iii.     SBCSD has amended its current Detentions and Corrections Manual Grooming Equipment Policy No. 925.00 regarding the cleaning and disinfecting of grooming equipment to comply with all applicable local, state and national requirements and standards, and thereafter ensure continued compliance with the existing or amended policy.

### D. Sick Call Process/Health Care Requests

i.     SBCSD has implemented an electronic, kiosk system to permit inmates to make a variety of requests. SBCSD shall ensure that the kiosk system is configured to permit inmates to make non-urgent and non-emergent health services requests through the kiosk terminals, that the requests are sent electronically directly to health service personnel, that inmates shall have the ability to track electronically the status of their requests and that the health care request system complies with NCCHC standard J-A-01 ("Access to Care"). SBCSD will also provide signage and notices on the kiosk screens to explain to inmates how to make requests for urgent or emergent health care needs.

ii.     SBCSD shall ensure, at a minimum, continued compliance with Detentions and Corrections Health Services Division Operational Procedural Manual Policy No. 306, regarding the sick call process, as well as NCCHC standards J-E-07 (regarding non-emergency health services requests) and J-E-08 (regarding emergency services). NCCHC standard J-E-07 requires a face-to-face encounter with the inmate within 48 hours on weekdays and 72 hours on the weekend. Nevertheless, SBCSD will make good faith efforts to have inmate-patients see a clinician for a face-to-face encounter within 24 hours of a sick call request.

### E. Specialty Care

SBCSD shall implement a comprehensive specialty clinic scheduling procedure with accountability for the entire Department. The EHR is anticipated to comply with this provision.

3

That system shall require the following:

    i.    Emergency consultations or procedures shall be provided immediately.

    ii.    Urgent consultations or procedures shall be scheduled to be provided in 14 days.

    iii.    Routine consultations or procedures shall be scheduled to be provided within 90 days.

    iv.    Develop and implement a tracking system that identifies and documents the specialty referral date, the date the referral was sent to the clinic, the date the appointment is confirmed, the date the appointment is completed, and, if the appointment is rescheduled or canceled, the reason therefor.

    v.    Specialty care documentation from an outside source shall be evaluated by a provider (MD, NP or PA) promptly upon the patient's return to the facility. Recommendations from the specialist shall be reviewed by the Chief Medical Officer and implemented as ordered. The provider shall make a clinical judgment about whether seeing the patient is necessary, and, if so, when.

### F.    Death Review Process

SBCSD is complying and will continue to comply with NCCHC standard J-A-10 ("Procedure In the Event of an Inmate Death") which provides that all In-custody deaths are to be reviewed to determine the appropriateness of clinical care; to ascertain whether change to policies, procedures, or practices are warranted; and to identify issues that require further study. All deaths shall be reviewed within 30 days with the information then available and again when the Coroner's report is available. The death review shall consist of an administrative review, a clinical mortality review, and a psychological autopsy if death is by suicide and a written report shall be prepared. Corrective actions identified through the mortality review process shall be implemented and monitored through the facility's CQI program for systemic issues, and through the staff education program for staff related issues.

### G.    Nursing Culture

Clinical staff shall be issued, and be required to wear, identification tags that indicate their licensure (e.g., RN, MD), their first name and last initial.

### H.    Continuous Quality Improvement

SBCSD shall continue to bring its Continuous Quality Improvement ("CQI") process into compliance with NCCHC Standard J-A-06 ("Continuous Quality Improvement") and to ensure that its CQI process meets such standard. SBCSD has hired a Supervising RN II to oversee the CQI program and full implementation of the CQI program shall occur by March 30, 2018.

4

## I.    Diagnostics

SBCSD operates a number of specialty clinics at WVDC. SBCSD will continue to consider new technologies and methodologies in the event that it may become appropriate to establish an on on-site diagnostics laboratory to complement the existing clinics.

As of January 1, 2016, SBCSD has developed and is implementing a policy to ensure that all laboratory results are returned to the provider within a clinically appropriate time.

## II.    MENTAL HEALTH CARE

### A.    Organizational Structure

SBCSD has developed and shall continue to implement a comprehensive organizational chart that clearly defines the scope of services, chains of authority, performance expectations and standards of mental health services via approved and implemented policies.

i.    Each psychiatrist shall be assigned to a housing unit for service delivery. Patients will be scheduled to see their assigned psychiatrists whenever possible to ensure continuity of care.

ii.    Mental health staff will immediately maintain at each jail facility an accurate mental health case list ("caseload") which at a minimum lists the patient's name, medical chart number, current psychiatric diagnoses, date of booking, date of last appointment, date of next appointment, and the name of the treating psychiatrist.

iii.    Mental health staff will maintain accurate logs for suicide watch, use of seclusion or restraints, administration of involuntary medications, hospital and emergency room referrals and admissions, 5150 holds, patients who have been assigned treatment guardians, patients in specialized housing unit by location, and patients who refuse medications.

### B.    Policies and Procedures

i.    SBCSD has adopted and is implementing policies and procedures that include the following:

a.    A complete menu of current mental healthcare programming and services.

b.    Minimum and maximum timeframes for when each type of mental healthcare service will be completed, including but not limited to laboratory tracking and psychiatry follow-up services, in accordance with NCCHC and professional standards.

c.    An intake and referral triage system to ensure timely and effective resolution of inmate requests and staff concerns pertaining to mental healthcare.

5

Case 5:19-cv-00305-RGK-KK Document 1 Filed 05/13/19 Page 69 of 113 Page ID #:69
Case 5:18-cv-00885-RGK-KK Document 81 Filed 03/28/18 Page 23 of 98 Page ID
#:767

        d.      Specific credentialing requirements for the delivery of mental healthcare services, including but not limited to the following: (a) only licensed mental health professionals may make critical treatment decisions; (b) unlicensed healthcare staff will not restrict access to higher levels of service or independently diagnose patients; and (c) the minimum staffing credential required to classify patients as having a seriously mentally illness ("SMI").

        e.      The following definition of "serious mental illness" taken from APA, *Psychiatric Services in Correctional Facilities* (3d ed.), pp. xvi-xvii that will apply to the Remedial Plan: "Psychiatric disorders that include psychotic symptoms, at least on an intermittent basis, are uniformly considered to meet the criteria for [serious mental illness]. Schizophrenia, schizoaffective disorder, and delusional disorder are examples of such serious mental illnesses. Other mental or emotional disorders (e.g., major depression, bipolar disorder, posttraumatic stress disorder), whether acute or chronic, that result in serious distress or serious functional impairment that substantially interferes with or limits one or more major life activities almost always meet criteria for [serious mental illness]. Some prisoners with severe personality disorders, cognitive disorders, or adjustment disorders will meet such criteria either temporarily or chronically."

        f.      Clear definitions of all abbreviations.

        g.      Clear directives for clinical monitoring of inmates, including but not limited to those who are involuntarily medicated, restrained or secluded, segregated or on suicide watch.

        h.      Descriptions of specialized mental health programming that specifically identify admitting and discharge criteria and the staff members who have the authority to place inmates in specialized mental health housing.

        i.      Mental health assessments for those designated as SMI should be performed by a licensed mental health professional to determine if mitigating factors are present and most importantly if the inmate cannot tolerate placement in a segregated environment and should be diverted for specialized mental health housing or suicide watch.

        j.      Procedures for conservatorships, guardianships, involuntary medications, and other appropriate measures for the management of inmates with serious mental illness who lack the capacity to give informed consent, in accordance with relevant state law.

        k.      Training for all staff members who are working with special needs and mentally ill inmates in all aspects of their respective duty assignments.

        ii.      The official operating manual for all mental healthcare services shall be SBCSD policies and procedures. Any process flowcharts that are developed shall be attached to the corresponding policy.

        iii.      Mental health care staff and custody staff in mental health, suicide prevention, and intake units, have been and will continue to be trained with respect to the

6

policies and procedures. All other custody staff will be trained with respect to the revised policies and procedures within 12 months after adoption of SBCSD's revised policies and procedures.

### C.    Staffing

        i.      SBCSD will complete a staffing analysis by January of each year, commencing in 2017 for the purpose of estimating an adequate number of mental health professionals, both psychiatrists and counselors, required to provide mental health services that meet professional standards of care and the requirements of this Remedial Plan. This analysis will be based on accurate data that reflects the expected number of contacts for each contact type and estimates of the average amount of timed needed to complete an adequate contact.

        ii.     SBCSD shall provide and maintain sufficient staff, including but not limited to licensed mental health professionals, to meet professional standards of care and to execute the requirements of this Remedial Plan.   At least 90% of the mental health staff positions shall be filled with staff attending work (and not on leave or otherwise not regularly attending work) within 12 months of the date the Consent Decree is issued by the Court.

        iii.    By April 1, 2018, SBCSD shall ensure that at least one licensed mental health professional is on site 24 hours a day at West Valley Detention Center (WVDC) to complete comprehensive assessments on inmates deemed an emergent referral, inmates considered for suicide watch, pre-segregation assessments of inmates consistent with SBCSD policies and procedures, and crisis calls.

        iv.    SBCSD shall immediately develop and maintain staffing documents that timely and accurately track staffing levels, shift and duty assignments, work locations, and shortages.

        v.     SBCSD shall provide and maintain sufficient correctional staff to transport and escort inmates for mental health services in confidential settings, and to provide direct security supervision in specialized mental health housing units during programming and activity hours.

### D.    Medication Administration

        i.      Nursing staff shall verify psychiatric medications at intake. Inmates with verified, current prescriptions written by SBCSD providers and that have not expired will have their prescriptions continued with the verbal approval of the on-call psychiatrist. Psychiatrists will review and order as appropriate within 24 hours of intake all verified prescriptions.

        ii.     The first doses of medications will be administered within 24 hours of a doctor's order.

        iii.    SBCSD shall develop a policy that adequately addresses inmates' refusals of psychiatric medications and implement an appropriate procedure to notify clinicians of

7

medication non-compliance.

iv.     Some psychiatric medications shall be available only through non-formulary ordering procedures when the pharmacy and therapeutics committee in conjunction with the psychiatric medical director determines there are significant patient safety issues.

### E.     Clinical Services and Practices

i.     SBCSD shall develop and implement policies and procedures that incorporate guidelines for laboratory studies and monitoring metabolic syndrome for inmates prescribed psychiatric medications.

ii.     Clinicians (qualified mental health professionals) shall have access to the medical record for all scheduled clinical encounters and may request and receive archived records for an inmate with a history of serious mental illness and previous incarcerations.

iii.     Clinicians shall provide counseling services to inmates based on individualized needs and as clinically appropriate.

### F.     Suicide Prevention

i.     Clinicians shall complete and document a suicide risk assessment, including the use of a suicide risk assessment tool, during all initial mental health encounters for inmates on suicide watch.

ii.     All initial mental health encounters by a QMHP ("Qualified Mental Health Professional") or psychiatrist will include a comprehensive assessment excluding communications via a unit rounds encounter.

iii.     SBCSD shall maintain the capacity to offer counseling services to inmates on suicide watch and psychiatric observation as clinically indicated or when ordered by a psychiatrist.

iv.     SBCSD has modified and, as modified, will implement its policy regarding use of a safety cells to allow for frequent out of cell restroom access and provision of suicide resistant smocks, blankets and bedding, etc. unless there is written documentation that the inmate uses these items in such manner so as to prevent safe monitoring of their behavior.

v.     Inmates who are at the highest risk of suicide or self-injury shall receive constant face-to-face observation followed by a lower level of a staggered 15-minute watch.

vi.     Correctional officers will ensure that inmates maintained on suicide watch and placed in holding cells with pony walls or other sight obstructions remain in the line of sight of correctional staff at all times until clinical staff assess and assign a level of suicide risk and appropriate monitoring intervals.

8

vii.     Whenever possible, inmates who require suicide and other psychiatric close observation will be housed in a health services unit specifically designed for this purpose or other health monitoring. But in all events, inmates on suicide watch must be housed in suicide resistant cells.

viii.     Inmates restrained in a chair shall never be housed in a locked cell unless they are under constant face-to-face supervision.

ix.     SBCSD shall provide all inmates on suicide watch with suicide resistant smocks, blankets and bedding at all times, unless a psychiatrist restricts these items for safety purposes based on a comprehensive assessment.

x.     The suicide prevention policy shall require instruction to security staff on the frequency of checks and procedures to ensure an adequate safety check has been completed and documented.

xi.     Whenever staff and inmate safety permits, inmates on suicide watch shall receive psychiatric interviews in a sound private environment conducive to establishing therapeutic rapport. Psychiatrists and correctional staff will jointly decide whether the interview room door will remain open or if correctional staff will be in the room. In situations where the psychiatrist and the correctional officer cannot reach a resolution, the security supervisor will make the decision. Staff will document any reasons why clinical encounters could not be conducted out of cell or with sound privacy.

xii.     Correctional staff will offer inmates on suicide watch showers on a regular schedule.

xiii.     Cognitive behavior and supportive counseling shall be available when appropriate to inmates on suicide watch.

xiv.     QMHPs will evaluate inmates released from suicide watch within 24 hours of their release.

xv.     Psychiatrists will evaluate inmates released from suicide watch based on individualized needs.

xvi.     Psychiatrists shall meet with correctional officers to review any inmates housed on suicide watch for more than three days. These meetings will be documented in the form of minutes (stored and maintained by mental health staff) or by entry in the individual inmate's record.

xvii.     SBCSD will provide all security staff with eight hours of initial training and two to four hours of training annually regarding suicide prevention and the identification and approach to mentally ill inmates. All healthcare staff should receive a minimum of 2 hours of training annually on suicide prevention and the identification of mentally ill inmates.

9

### G. Patient Privacy

     i.    Clinicians will complete all clinical encounters in a sound private environment conducive to establishing therapeutic rapport, such as in individual office space, whenever safely possible.

     ii.    SBCSD will identify and provide space for the delivery of frequent and adequate mental healthcare services in appropriate therapeutic settings for inmates in specialized mental health housing and segregation.

### H. Specialized Mental Health and Segregation Housing

     i.    SBCSD shall develop and implement programming and mental healthcare services for inmates (male and female) with serious mental illness who cannot be housed in general population. These inmates will no longer be classified as "UB," and instead will be classified as "SMI" (seriously mentally ill) that will be defined in the policies and procedures.

     ii.    SBCSD shall develop a policy and procedure pertaining to admitting criteria for existing and future specialized mental health housing units.

     iii.    Inmates with serious mental illness who cannot be housed in general population will be provided with increased out-of-cell time and structured therapeutic activities appropriate for the acuity of their mental health needs. Such inmates who are locked down for any reason other than psychiatric observation will be offered a minimum of 10 hours per week of unstructured out-of-cell time and 5 hours per week of structured out-of-cell time. All out-of-cell time shall be documented, indicating the type and duration of the activity.

     iv.    Those inmates with a serious mental illness who also require special mental health housing, once developed and staffed, will receive enhanced clinical monitoring and programming as dictated by policy and procedure.

     v.    SBCSD shall monitor and conduct rounds for all inmates in segregation in accordance with NCCHC Standard J-E-09 ("Segregated Inmates"). Nursing staff shall immediately report signs of psychological decompensation to mental health staff. Clinicians shall evaluate inmates identified as having mental health needs during these rounds in a sound private space outside of the inmate's cell.

     vi.    Prior to placement or within the next shift if placement is after the normal hours for clinical coverage, all inmates identified as SMI shall be screened face to face by a licensed mental health clinician to determine whether there are any mental health contraindications to segregation. If the clinician finds there are any mental health contraindications to segregation, that inmate shall not remain in segregation absent extraordinary and exceptional circumstances but rather be moved to psychiatric observation for evaluation and stabilization. Any extraordinary and exceptional circumstances shall be documented and reviewed by mental health and custody supervisors. SMI inmates with serious mental illness who are placed in segregation for more than 24 hours shall have their cases reviewed by the

10

security supervisor and the mental health supervisor on a weekly basis to determine if they can be diverted or removed from segregation.

## I.  Record Keeping

A mental health expert, approved by both parties, shall review SBCSD's proposed electronic health forms and make recommendations for modifications and additions.

## J.  Treatment Planning

      i.    Clinicians ensure that each inmate on the mental health caseload receives an individualized treatment plan as part of the initial mental health assessment that reflects actual services that will be provided to that person.  This plan is the "Plan" portion on the assessment template in the electronic health record and usually consists of referrals to psychiatry, programming activities or individual counseling, discharge planning and specialized mental health housing.  Thereafter, for inmates in the general population, their treatment plan is the progress note section documenting the clinical plan.

      ii.    Individualized treatment plans for inmates housed in specialized mental health programming units shall be documented on a free-standing multidisciplinary form in a problem-oriented format to be reviewed and approved by the appointed mental health expert.  A policy and procedure will be revised to direct this process.

## K.  Disciplinary Process

SBCSD shall ensure that disciplinary charges against SMI inmates are reviewed by a clinician to determine the extent to which the charge was related to mental illness or a developmental disability and to ensure that the inmate's mental illness or developmental disability is used as a mitigating factor, as appropriate, when punishment is imposed and to determine whether placement into segregation is appropriate. SBCSD shall develop a policy, procedure and form for input from mental health staff into the disciplinary process for SMI inmates with pending major disciplinary sanctions.  Data from this process should be tracked to ensure compliance with the policy.

## L.  Discharge Planning

      i.    SBCSD shall ensure that SMI inmates in specialized mental health units prescribed psychiatric medications have access to transitional prescription(s) immediately upon release from jail.

      ii.    Inmates with SMI on specialized mental health units will receive enhanced discharge planning as defined by policy and include at a minimum documented assistance with housing, individualized treatment plan driven after care appointments and services, health insurance applications, other benefit services and hospitalization, if clinically indicated via a 5150.

11

iii.    Inmates on the mental health caseload in general population shall receive an initial discharge needs assessment and plan at the time of their initial comprehensive assessment. All community resources shall be listed in the inmate orientation materials on the electronic kiosks so that all inmates can determine which services they wish to access. Inmates should be informed via orientation materials that they can request assistance from a social worker through the normal request for service process should they need additional advice regarding discharge preparations.

### M.    Continuous Quality Improvement

i.    SBCSD shall develop a Continuous Quality Improvement ("CQI") Program which will adhere to NCCHC standard J A-06. The CQI process shall be site-specific and include review of the delivery of mental healthcare services. The SBCSD health manager and the medical, psychiatric, dental, and nursing directors will attend and participate in this process at a minimum of every quarter. Formal minutes will be taken and maintained whenever the committee convenes.

ii.    Consistent with NCCHC standard J-A-06, the CQI process shall include the development of accurate tracking mechanisms to permit the monitoring, timeliness and effectiveness of care, shall ensure at least annual review of such mechanisms, and shall recommend corrective action for all deficiencies. SBCSD has developed, shall utilize and shall regularly review, update and modify as appropriate, a Quality Assurance matrix that is organized by clinical process and tracks essential indicators for monitoring the timeliness and quality of services, which shall be made available to counsel for monitoring.

iii.    The CQI process studies shall include (a) a clearly articulated hypothesis and methodology to determine if standards have been met, including a sampling strategy; (b) data collection; (c) analysis of data to identify trends and patterns; (d) analysis to identify the underlying causes of problems; (e) development of remedies to solve problems; (f) a written plan that identifies responsible staff and establishes a specific timeline for implementing remedies; (g) follow-up data collection; and (h) analysis to determine if the remedies are effective.

iv.    SBCSD will conduct peer and supervisory reviews of all clinicians at least annually to assess compliance with policies and procedures and professional standards of care per NCCHC standard J-C-02.

## III.    DENTAL CARE

### A.    Definitions in Oral Care Policy

SBCSD shall revise San Bernardino County Sheriff's Department, Detention and Corrections Bureau, Health Services Division, Operational Procedure Manual, Policy No. 324, entitled "Oral Care" ("Policy No. 324"), to distinguish between routine, urgent and emergency dental care and to define "restorative" dental treatment.

12

### B.     Requests for Dental Services

Policy No. 324 shall be revised to provide clarify how inmates should request routine, urgent or emergency dental care services, including where, when and by whom treatment will be provided for each level of services, including specifically the relevant time frames within which each level of service will be provided.  In addition, Policy No. 324 should clarify the triage process for determining whether care requested is routine, urgent or emergent and how referrals to other health services are made.

### C.     Preventive Care

In addition to providing instruction in oral hygiene and preventative education, SBCSD shall include in Policy No. 324 a provision that inmates will be provided with toothpaste and appropriate interdental cleaners to facilitate oral hygiene and preventative care.

## IV.    USE OF FORCE

### A.     Use of Force Policy

By April 30, 2018, SBCSD shall adopt, complete staffing training on, and implement the Use of Force policy attached hereto as **Exhibit 1**.

### B.     Training

Every custody staff member and academy attendee shall receive at least six (6) hours of initial training with respect to the policy to ensure that each such staff member fully understands the expectations, restrictions and their obligations with respect to using and reporting force.

Supervisory staff who will investigate use of force incidents shall receive adequate training on how to conduct such investigations and how to deal promptly with obvious staff misconduct.

### C.     Other Matters for Consideration

i.     SBCSD shall consider developing and adopting some form of Early Warning System to identify staff who require further training and/or correction in the use of force.

ii.     SBCSD shall consider whether and to what it extent it can or should utilize a direct supervision model of inmate supervision in the jails.

//

//

13

## IV. RESTRICTIVE HOUSING

### A. Definitions

      i.     "Restrictive Housing" shall mean a placement that requires an inmate to be confined to a cell at least 22 hours per day for the safe and secure operation of the facility. (See American Correctional Ass'n, "Restrictive Housing Performance Based Standards," (August 2016), p. 3.)

      ii.    "Serious mental illness" shall have the meaning set forth in Section II.A.5 of this Remedial Plan.

### B. General Principles

      i.     By December 31, 2017, SBCSD shall develop, adopt and implement policies and practices which mitigate the potential harmful effects of isolation and ensure that inmates shall be housed in the least restrictive setting necessary for their own safety, as well as the safety of staff, other inmates, and the public.

      ii.    The changes described above will impact rules and policies related to classifications, housing, discipline, privileges, and programing, to the extent necessary to achieve the goals outlined above.

      iii.   To the greatest extent feasible, SBCSD policies and practices shall be modified to eliminate routine, widespread, and long-term use of restrictive housing.

      iv.   The Parties stipulate that adoption and implementation of the policies attached as **Exhibit 2** satisfy the policy requirements of this remedial plan.

### C. Restrictive Housing and Inmate Classifications

     The policies and practices adopted pursuant to this remedial plan shall maximize both "tier time" and outside recreation time for all classifications of inmates.

### D. Restrictive Housing for Disciplinary Purposes

      i.     SBCSD policies shall state that an inmate may be confined in restrictive housing for disciplinary purposes after the inmate has received notice of the charges against him/her, a shift supervisor has conducted a disciplinary hearing at which the inmate was given an opportunity to rebut the charges and the inmate is adjudicated guilty of the alleged violation.

      ii.    Because isolation can, in some circumstances, exacerbate an inmate's behavioral issues, SBCSD shall ensure that:

Case 5:19-cv-00896-RAK-KFB Document 8 Filed 05/13/19 Page 78 of 113 Page ID #:776
Case 5:19-cv-00896-RAK-KFB Document 8 Filed 03/28/19 Page 32 of 98 Page #D
#:776

a. The maximum disciplinary sanction shall include no more than 30 consecutive days of restrictive housing.

b. Inmates receiving multiple discipline violations arising from a single incident shall be disciplined only for the most serious offense.

c. Any inmate who is repeatedly returned to disciplinary restrictive housing with no apparent change in behavior or substantial breaks between disciplines will be assessed by a multidisciplinary team that will consider alternatives to disciplinary restrictive housing and develop and implement an individualized behavior plan for the inmate.

iii. SBCSD shall review its administrative charging practices to ensure clarity and consistency and that penalties imposed are not excessive. The Corrections Bureau will add definitions of offenses (e.g. "Major Disturbance") where necessary to ensure that penalties for similar infractions are imposed consistently.

iv. SBCSD shall review the use of the disciplinary diet. As part of this review the Corrections Bureau will conduct a 6-month study at one of the Type II facilities during which the disciplinary diet will not be used as a disciplinary sanction. At the conclusion of the study period, SBCSD will reassess whether, and to what extent, it will continue to utilize the disciplinary diet. SBCSD's decision shall be subject to the dispute resolution process set forth in the Consent Decree.

**E.  Restrictive Housing and Inmates with Serious Mental Illness**

i. If, and when, Mental Health Services determines that an inmate with a serious mental illness should be housed in some form of clinical segregation to facilitate safe and proper treatment of the inmate, SBCSD correctional staff shall accommodate that housing request, even where the requested clinical segregation would meet the definition of restrictive housing. This clinical segregation shall occur only pursuant to orders of Mental Health Services and shall continue only for as long as clinically indicated.

ii. Before an inmate with a serious mental illness is found guilty of misconduct or, as a result of an adjudication of guilt, is placed in segregated housing (as that term is defined in Section II.H. of this Remedial Plan), SBCSD shall have complied with Section II.K. of this Remedial Plan.

**F.  Conditions, Privileges, and Programming**

i. Any cells used for restrictive housing shall meet the same minimum standards as those applicable to other inmate accommodations.

ii. The conditions, privileges and programming for inmates with serious mental illness who are segregated from the general population shall be governed by Section II.H. of this Remedial Plan.

15

iii.    If an entire classification of inmates is in restrictive housing for a period of 30 days or more, those inmates shall be provided privileges and programming which are the same or equivalent inmates who are not in restrictive housing.

## V.    AMERICANS WITH DISABILITIES ACT COMPLIANCE

Within 60 days after approval of this Remedial Plan by the Court, SBCSD shall adopt and implement the policies attached hereto as **Exhibit 3.**

16

# EXHIBIT 3

# Deaths Among County's Inmates Continue At An Accelerated Pace

Posted on **December 19, 2016** by **Venturi**

With the close of 2016 approaching, the pace of in-custody deaths among inmates in San Bernardino County's jails and prisons continues at an alarming pace.
Known deaths within the walls of detention facilities within the county in 2016 had reached 13 by last week. That number did not include those at the Chino Institution for Men or the federal government's two prisons in Adelanto

As of Monday, December 12, ten inmates had died in the custody of the San Bernardino County sheriff and three had died at the California Institution for Women in Chino since January 1, 2016.

Nine of the inmates under the sheriff's supervision died at West Valley Detention Center and one died in custody at the sheriff's Central Jail in San Bernardino. While sheriff's officials maintain those deaths were medical-related or suicides, there is some information to controvert that.

Nevertheless, sheriff's officials have boasted that ten medical related deaths among an inmate population as large as that maintained by the sheriff is "below average" and "fewer than what would normally be expected."

The most recent death was that of a 39-year-old man, Shaun Green of Glendora, on December 11. Green had been jailed on December 6 on suspicion of assault with a firearm, terrorist threats, and being under the influence of a controlled substance after his arrest by Fontana police on December 4.

The sheriff's department maintains that pre-existing medical conditions contributed to Greene's death and that his death was precipitated by his having lost consciousness and slipped out of his wheelchair while eating lunch in the medical housing unit at West Valley shortly after noon Sunday. He was taken to Kaiser Permanente Medical Center in Fontana, where he died an hour later, according to the San Bernardino County Sheriff's Department.

The department said that after his arrest by Fontana PD, Green was taken to Arrowhead Regional Medical Center in Colton, the main campus of San Bernardino County's public hospital, where he underwent examination and treatment by physicians for two days because of his medical condition. He was thereafter booked into West Valley's medical housing unit, where he was being monitored and treated by the jail's medical staff.

The Sentinel does not have specifics or even the names of the four inmates in the county sheriff's custody who died between late April of this year and prior to Green's death. It

http://sbcsentinel.com/2016/12/deaths-among-countys-inmates-continue-at-an-accelerated-pace/

does have particulars on the first five such fatalities this year, which occurred at a rate of one every 19 days in the three month and five day period running from January 1 to April 5.

On or about January 4, 2016, Fernando Cordova, 58, experienced a medical emergency. He was transported to Kaiser Hospital in Fontana for medical treatment, where he was pronounced dead.

On or about February 7, 2016, Michael O'Brien, 40, experienced a medical emergency while in custody at West Valley. He was transported to Arrowhead Regional Medical Center in Colton for treatment, where he was pronounced dead.

On Wednesday, February 10, 2016, Angela Zuniga, a 33-year old resident of San Bernardino, who had been remanded into custody at the West Valley Detention Center on January 11 on charges of shooting at an inhabited dwelling and being a felon in possession of a firearm, gave birth to a boy by C-section and underwent a hysterectomy at the county hospital, known as the Arrowhead Regional Medical Center. Three days later, Zuninga was returned to custody at West Valley Detention Center. Her jailors assigned her to a clean-up detail. After she experienced bleeding and complained of abdominal pain, she was placed in solitary confinement. Other inmates report that she was wailing and requesting medical assistance that was not forthcoming.

On Saturday, February 27, 2016, according to the sheriff's department, "Zuniga experienced a medical emergency and at 10:00 p.m. was transported to Arrowhead Regional Medical Center. Despite lifesaving measures, Zuniga was pronounced deceased on Sunday, February 28, 2016, at 5:41 a.m."

Investigators from the San Bernardino County Sheriff's Department Specialized Investigations Division, detective Troy Mooradian and sergeant Robert Warrick, conducted an investigation into Zuniga's death. Their report has not been released, but the department has made a preliminary finding that her death was attributable to "medical" causes.

On Easter Sunday, March 27, 2016 at 6:41 a.m. deputies at the West Valley Detention Center found an inmate, Federico Juarez Guardado, 30 of San Bernardino, unresponsive in a jail cell. Guardado had been jailed on a contempt of court charge, a misdemeanor. According to the department, Guardado "was housed alone and appeared to be suffering a medical emergency. Medical staff assigned to the West Valley Detention Center and emergency medical responders from American Medical Response and Rancho Cucamonga Fire Department performed lifesaving measures. At 7:00 a.m., the inmate was pronounced deceased at the jail."

Neither the investigation of his death by detective Brendan Motley and sergeant Greg Myler of the sheriff's specialized investigations division nor the autopsy conducted by the Riverside County Coroner's Office has been made public.

On April 5, 2016 at 10:15 a.m. a San Bernardino County sheriff's deputy witnessed Michael Paul, 48 and a resident of Twin Peaks, jaywalking in the 23000 block of Crest Forest Drive. According to the department, "The deputy evaluated Paul, determined he was under the influence of a controlled substance and took him into custody. Paul was

placed in a single man holding cell and following a brief interview, deputies determined Paul had weapons in his residence, which were in violation of a criminal restraining order."

After deputies obtained a search warrant for Paul's residence and found firearms and narcotics there and arrested Paul's 37-year-old girlfriend, Emily McKernan,they returned to the Twin Peaks station and, according to the department, "At 5:39 p.m. prepared to interview Paul regarding the evidence located at his home and found he had hanged himself in the cell. Medical personnel responded and Paul was pronounced dead at the scene."

At the time of Paul's death, there had been a spate of sheriff's department in-custody deaths, numbering ten over a roughly 13 month period going back to March 2015. In that span, inmates had been dying in custody at a rate of one every 38 days. Those deaths included at least one and perhaps as many as four deaths which might have been homicides, although the department maintains that only one of those – an inmate's killing of his cellmate – was anything other than medically related or a suicide.

On Saturday, March 28, 2015 at 1:30 p.m. Gilbert Mesa, 33 of Sugarloaf, arrived at the Big Bear Station at 477 Summit Blvd. in Big Bear Lake to provide a statement regarding an assault with a deadly weapon investigation, in which he was named as the suspect. Following the interview, Mesa was arrested and booked into the Big Bear jail. According to the sheriff's department, Mesa was the sole occupant of the cell. At 8:50 p.m. the jail deputy was conducting his observation logs when he saw Mesa hanging from the top of his bunk, with his shoelaces tied around his neck. Deputies quickly cut the shoelaces from his neck, called for medical aid and began CPR. Fire personnel responded and transported Mesa to Bear Valley Community Hospital. On Sunday, March 29, 2015 at 1:30 a.m. Mesa was transferred to Riverside Community Hospital.

On Tuesday, March 31, 2015 at 9:19 p.m. Mesa was pronounced dead. The Riverside County Coroner conducted an autopsy on Wednesday, April 1, 2015. The cause of death was determined to be anoxic encephalopathy due to hanging.

Sheriff's homicide investigators sergeant John Gaffney and detective Eddie Bachman concluded Mesa committed suicide.

On Wednesday, April 15, 2015 deputy Gary Brandt, deputy Shannon Deasey, deputy Peter Gentry and sergeant Mike Rude responded to a report at 1:17 a.m. of a man trying to damage an emergency fuel shutoff switch at a Valero gas station at 27767 Base Line in Highland.

When deputies arrived they found 28-year-old Joseph Slater, later identified as a homeless man who frequented the area to panhandle and was described by those in the area as often wandering the area yelling at imagined people or holding conversations with himself, "behaving oddly." When deputies detained him, Slater became combative, deputies used pepper spray on him and when he forced his way out of the patrol car, the deputies tackled him. According to the sheriff's department "force was used to overcome his resistance." After Slater evinced, according to the department, "symptoms of having a medical emergency," paramedics were summoned. He was transported to a hospital,

where he later died.

On April 27, 2015, Jeremiah Ajani Bell, 22 of Rialto, who had been arrested for attempted murder, was booked at West Valley Detention and placed into a cell with Rashad Paul Davis, 19 of Ontario, who had been arrested for robbery and had been in custody at West Valley since March 26, 2015. Not quite four weeks later, on Friday, May 22, 2015 at 10:02 a.m., West Valley Detention Center deputies found Davis unresponsive on the floor of the two-man cell he occupied with Bell. Davis received immediate medical attention and was transported to Kaiser Hospital in Fontana, where he was pronounced dead.

An autopsy on Davis was conducted on Tuesday, May 26, 2015, by the Riverside County Coroner's Office. The cause of death was determined to be from blunt force injuries. Homicide detail detective Gary Hart and sergeant John Gaffney concluded that Jeremiah Ajani Bell was responsible for the death of Rashad Paul Davis.

On Saturday, September 12, 2015 at approximately 2:25 p.m. Karla Renae Jones, 23, a convicted arsonist awaiting a probation-violation hearing, was found by deputies at the West Valley Detention Center unresponsive in her single-person cell. According to the sheriff's department "it appeared as though she had committed suicide. Jones was transported to a nearby hospital, where she was later pronounced deceased." Jones had been in custody at West Valley Detention Center for approximately two weeks prior to the incident.

Detective Justin Long and sergeant Trevis Newport of the San Bernardino County Sheriff's Department Homicide Detail reached the conclusion that she had committed suicide.

On Sunday, October 18, 2015, at approximately 1:34 p.m., deputies assigned to a housing unit at West Valley Detention Center found inmate Robert Lundberg, 50 of Adelanto, who was arrested four days previously and charged on October 16 with possession of a controlled substance for sale, on the floor of the housing unit just below the second tier. Medical staff from West Valley Detention Center and Rancho Cucamonga firefighters and personnel from American Medical Response also responded. Lundberg was pronounced dead at the scene. According to the sheriff's department, "Lundberg was the only inmate assigned to his cell and was the only inmate out of his cell at the time of the incident."

The Riverside County Coroner's Office conducted an autopsy and determined Lundberg's cause of death was severe head trauma.

Sheriff's Department Specialized Investigations/Homicide Detail, detective Mark Goodwin and sergeant Jason Radeleff concluded Lundberg committed suicide.

On or about December 6, 2015, Salvador Munoz, 54, suffered a medical emergency while in custody at West Valley Detention Center. He was transported to Kaiser Hospital in Fontana for treatment, where he was pronounced dead. According to the sheriff's department, his death was medically related.

The lion's share of the deaths in San Bernardino County's jails over the last 13 months occurred at the West Valley Detention Center in Rancho Cucamonga, which has a

3,291-inmate capacity and averages roughly 3,000 inmates per day. There were no fatalities at the High Desert Detention Center in Adelanto, which is operated by the sheriff's department and which opened in early 2015 and since that time has housed on average 700 inmates daily. Nor were there any deaths at the Glen Helen Rehabilitation Center in Devore, which over the same period has housed an average of 1,020 inmates per day. Another relatively large scale prisoner holding facility run by the sheriff's department is the Central Jail in San Bernardino, which is primarily used to house pre-sentenced county inmates and federal inmates, and averages a daily population of 930. No deaths occurred there in 2015 and one took place there in 2016. There thus appears to be a statistical anomaly attending the death rate at West Valley.

Through December 11, the sheriff's department was experiencing one death every 34.51 days in 2016.

There have been three in-custody deaths at the 1,883-inmate California Institution for Women in Chino so far in 2016.

On April 14, 2016 Erika Rocha, 35, who had been imprisoned at the California Institution for Women in Chino and was scheduled for release in October, from a perch on the top of a toilet lunged forward, her head in a noose formed from a bed sheet tied to a heating vent. She was dead when she was discovered, and state prison investigators concluded Rocha committed suicide and died of asphyxia.

On June 1, Shaylene Graves, 27 of Fontana, was imprisoned at the California Institution for Women in Chino and was due to be released on July 13 when she was found hanging.

On November 10, Bong Sook Chavez, 56 of San Pedro, an inmate at the California Institution for Women in Chino was likewise found hanging with a sheet around her neck. The investigation reports on the deaths of Graves and Chavez have not been released but the presumption is they committed suicide.

Officials at the Chino Institution For Men and the federal government's detention facilities in San Bernardino County had not responded to requests for information relating to in-custody deaths in 2016 by press time.

This entry was posted in **Uncategorized** by Venturi. Bookmark the **permalink** [http://sbcsentinel.com/2016/12/deaths-among-countys-inmates-continue-at-an-accelerated-pace/] .

# EXHIBIT 4

# VOICE

## More Deaths at San Bernardino County's West Valley Detention Center

Mar 10, 2017 | **In The News**

f
y





HeartChild

**invisiblechild**
AWARENESS PROGRAM AND RESOURCE FAIR

APRIL 13 FROM 6-8:30 P.M.

San Bernardino, CA





Being placed in county jail should not be a precursor to death; yet, inmates continue to die while in custody at San Bernardino County's West Valley Detention Center. In 2016, at least ten inmates died while in custody at the facility.

The bad luck experienced by too many inmates assigned to the West Valley Detention Center (West Valley) continued in recent weeks. The San Bernardino County Sheriff's Department issued two separate press releases announcing more inmate deaths at West Valley in late February.

PLAY FOR REAL





**ACROBATIC
MATHEMATICAL
THINKING (6)**

**MATHEMATICS**

On Tuesday, February 21, at 9:20 p.m., deputies reported they found inmate Kevin Plichta unresponsive in his cell. According to the sheriff's department, medical staff responded immediately and Plichta was transported to Kaiser Hospital in extremely critical condition. Due to the nature of his injuries, investigators were called upon to investigate.

Investigators determined that Plichta and his cellmate, Marcos Garcia, were both in the cell when Plichta's injuries occurred. As a result, investigators believe Garcia was responsible for the injuries sustained by Plichta. Their completed investigation was forwarded to the District Attorney for review and probable filing of murder charges.

Just four days later, on February 25, another inmate was found dead. Sheriff Department officials reported that at approximately 12:25 p.m. that day, a deputy at the jail was conducting observation logs when he saw inmate David Damits hanging from the top bunk. In a press statement, it was reported the deputy immediately cut the inmate down and began CPR until medical staff took over. Despite the deputy's efforts, Damits was pronounced dead at the scene. The report also stated that Damits was housed alone in a single-man cell.

Regardless of what Plichta and Damits did or did not do that led to their confinement at West Valley, they were under the care and supervision of the San Bernardino County Sheriff's Department that failed to keep them safe.

The Rise of Liquid Nutritional
Supplements

California's New Water Woes: What's In
The Water? & Groundwater Court
Ruling Favors Agua Caliente

f

y

© 2018 · theievoice.com

http://theievoice.com/more-deaths-at-san-bernardino-countys-west-valley-detention-center/

# EXHIBIT 5

**LOCAL NEWS**

# SAN BERNARDINO COUNTY: Rising number of jail deaths raise concern



SAN BERNARDINO COUNTY: Rising number of jail deaths raise concern

By **JOE NELSON** | jnelson@scng.com and **BRIAN ROKOS** |
brokos@scng.com | San Bernardino Sun
April 12, 2016 at 8:21 pm

In the last year, a dozen people have died after being admitted into San
Bernardino County jails, with more than half those deaths occurring in the
last four months.

Since January, seven people have died in county jails — more than all the in-
custody deaths that occurred in 2015. Four of those deaths are attributed to
pre-existing medical conditions and one a suicide by hanging. The causes of
death for two other inmates have yet to be determined, but homicide and
suicide have been ruled out, said sheriff's Lt. Brad Toms.

https://www.pe.com/2016/04/12/san-bernardino-county-rising-number-of-jail-deaths-raise-concern/

Of 2015's five deaths, three were suicides, one was a homicide and one a medical-related death, according to the sheriff's department.

"I think that's an alarming number," said Dale Galipo, a Woodland Hills attorney who specializes in civil rights and wrongful death cases involving law enforcement, many of them originating in the Inland Empire.

"I don't know all the details, but I think the people in charge of these jails should be concerned and look into the details of each case, what happened and what went wrong and what steps they could take to prevent these deaths from happening in the future," Galipo said.

The latest death occurred Sunday, when 32-year-old Riverside resident Cleveland Burris was found unresponsive in his single-man cell at the West Valley Detention Center in Rancho Cucamonga at 7:52 a.m. He was taken to Kaiser Permanente Fontana Medical Center, where he was pronounced dead at 8:47 a.m., authorities said.

Five days prior, on April 5, 48-year-old Michael Paul hanged himself with his shoelaces in a single-man cell at the Twin Peaks sheriff's station after being arrested on suspicion of being under the influence of drugs, according to sheriff's officials and Paul's mother, Joan Davis.

Despite the number of in-custody deaths since January, Toms said all inmates are screened by registered nurses during intake for pre-existing medical and mental health problems. Inmates who appear to suffer from acute medical conditions are taken by to the hospital and not returned to jail until they are cleared by the doctor, Toms said.

But that doesn't necessarily safeguard inmates from suffering a life-threatening medical emergency.

"There are just medical conditions that are going to happen," Toms said, disputing claims that inmates are subjected to long waits before being seen by a doctor or mental health professional.

"If anything, the time has shortened because we have more staff now," Toms said, adding that electronic kiosks are being installed at West Valley that will allow inmates to request appointments online, thus expediting the process.

Since prison realignment took effect in October 2011, the sheriff's department has grappled with meeting inmate demands for medical and mental health services while facing a sharp increase in inmate-on-inmate and inmate-on-deputy violence as more violent criminals are pouring into the jails, and for longer stays, Toms said.

Sheriff John McMahon was out of town and unavailable for comment Tuesday.

Experts and law enforcement officials say the number of in-custody deaths can be cyclical and defy explanation. After Riverside County reported 10 jail deaths in 2012, three in 2013 and one in 2014, there were 11 in 2015. But there hasn't been any in 2016, Assistant Sheriff Jerry Gutierrez said.

Experts say it is important to look at each death individually before drawing conclusions on whether there is a trend borne out of problems with correctional deputies or policies.

Michael Hackett, a retired assistant sheriff in Imperial County and former chief administrative officer for the Santa Clara County Department of Corrections, is an Oceanside-based criminal justice consultant who testifies as an expert witness on jail and police practices.

He was not aware of the facts of the San Bernardino cases and on Tuesday, spoke generally about best practices for jails. Hackett discussed three categories of inmate deaths: homicides, suicides and medical emergencies.

"Essentially," Hackett said, "homicides are not preventable inside or outside the jail. If somebody has decided he is going to take a life, it probably is going to happen."

The best way to prevent inmates from killing each other, Hackett said, is to make sure incompatible inmates are not placed in the same cell. That includes rival gang members, and those accused of misdemeanors and serious felonies.

"You can't necessarily forecast the behavior of every inmate, but you can get a handle on it," he said.

Galipo, the Woodland Hills attorney, is suing the county on behalf of the parents of Rashad Davis Jr., a 19-year-old developmentally disabled Ontario man allegedly beaten to death by his cellmate, Jeremiah Bell, at West Valley in May. It was the only homicide logged at the jail in 2015.

Davis was jailed on suspicion of armed robbery and petty theft, while Bell, determined by a judge to be mentally incompetent to start trial, was suspected of beating a Rialto man to death with a baseball bat.

With jail suicides, Hackett attributes those to either problems in the screening process or suspects hiding their intentions from jailers.

Lindsay Hayes, project director at the Baltimore-based National Center on Institutions and Alternatives and a nationally recognized expert on jail suicides, said a comparison of the number of suicides per 100,000 inmates from jail to jail is a better measure than raw numbers.

Hayes said jails with a low suicide rate are proactive with prevention programs.

"They don't wait for tragedy to happen," he said Tuesday from Mansfield, Massachusetts.

But there's more to suicide prevention than having a program in place.

"There are a lot of jurisdictions that follow their policies and procedures on suicide prevention, but they don't have good policies and procedures," Hayes said.

The Prison Law Office, a Berkeley-based nonprofit that advocates for prisoner rights, has fielded more than 700 complaints from inmates in San Bernardino County jails, alleging a pattern of excessive force by deputies against inmates and substandard medical and mental health care. The office alleged a "culture of violence" in San Bernardino County's jail system in an eight-page letter to McMahon in August 2014.

In February, the Prison Law Office filed a class-action lawsuit against the county on behalf of two West Valley inmates, alleging excessive use of force by deputies and substandard medical, mental health and dental care.

Prison Law Office Director Don Specter said in a telephone interview Tuesday that no additional plaintiffs have joined the lawsuit since it was filed.

He found the news about the in-custody deaths alarming.

"It raises serious concerns," said Specter. "It creates a sense of urgency."

He said San Bernardino County isn't the only county experiencing such problems.

In October, the Prison Law Office tentatively settled a class-action lawsuit filed in Riverside County, challenging the quality of medical and mental health care for inmates in the county's five jails.

"It's a statewide problem. A lot of counties are in this boat," Specter said.

Galipo said the issue boils down to policies, procedures and training to ensure inmates are housed safely and properly monitored by the deputies tasked with their safety.

"The reality is most of the people there are accused of a crime, not convicted of a crime, and it shouldn't be a death sentence for them," Galipo said.

Staff Writer Doug Saunders contributed to this report.

---

Want local news?

# Sign up for the Localist and stay informed

Enter your email to subscribe

**SUBSCRIBE**

## Joe Nelson

Joe Nelson is an award-winning investigative reporter who has worked for The Sun since November 1999. He started as a crime reporter and went on to cover a variety of beats including courts and the cities of Colton, Highland and Grand Terrace. He has covered San Bernardino County since 2009. Nelson is a graduate of California State University Fullerton. In 2014, he completed a fellowship at Loyola Law School's Journalist Law School program.

Follow Joe Nelson @GumshoeJoe

## Brian Rokos

Brian Rokos writes about public safety issues such as policing, criminal justice, scams, how law affects public safety, firefighting tactics and wildland fire danger. He has also covered the cities of San Bernardino, Corona, Norco, Lake Elsinore, Perris, Canyon Lake and Hemet. Before that

he supervised reporters and worked as a copy editor. For some reason, he enjoys movies where the Earth is threatened with extinction.

🐦 Follow Brian Rokos @Brian_Rokos



SPONSORED CONTENT

## Mom Takes A Selfie in Daughter's Dorm and Soon Realizes Her Terrible Mistake! ↗

By Upbeat News

upbeat



https://www.pe.com/2016/04/12/san-bernardino-county-rising-number-of-jail-deaths-raise-concern/

# EXHIBIT 6

**NEWS**

# Inmate deaths at San Bernardino County jails highlights medical care issues



The High Desert Detention Center in Adelanto (pictured), is among the county jails under public scrutiny for alleged inadequate medical care of inmates, which spurred a class action lawsuit in 2016 and, more recently, four claims against the county on behalf of Betty Lozano, and Adelanto resident who died after being booked into the jail in July.

By **JOE NELSON** | jnelson@scng.com | San Bernardino Sun
PUBLISHED: October 20, 2017 at 7:06 pm | UPDATED: October 23, 2017 at 9:50 am

In the last three years, 30 people have died in San Bernardino County jails with 18 of those deaths, or 60 percent, being medical-related, according to Sheriff's Department figures.

Last year, eight of 10 in-custody deaths, or 80 percent, were found to be medical-related while so far this year, four of eight in-custody deaths, or 50 percent, were determined to be medical-related, according to the Sheriff's Department.

Attorneys representing the family of an Adelanto woman who died in custody in July, apparently from a drug-related medical emergency, say the problem has become so bad jail nurses are speaking out and fear losing their licenses, and at least one former nurse is pursuing legal action.

"We think somebody needs to be looking into these deaths and find out exactly what's happening and put measures in place so they can be prevented," said Victorville attorney Sharon Brunner, who along with attorney Jim Terrell are representing the family of Betty Lozano, who died shortly after 11 p.m. July 26 after she stopped breathing at the High Desert Detention Center in Adelanto and was hospitalized.

### ALLEGATIONS DISPUTED

The Sheriff's Department has long stood by the quality and quantity of medical care its inmates receive and denies any allegations of medical neglect or mistreatment of its prisoners.

"We refute claims that our inmates are not getting the care they need. Inmates today have access to kiosks within their housing units and can request medical attention at any time," Lt. Sarkis Ohannessian said in an email. "Visiting a (doctor) in the jail today is faster than the attention you and I get from our personal healthcare providers. And, any patients requiring hospitalization are taken by ambulance to the hospital."

He said significant improvements have been made in recent years to address concerns of ailing inmates and the growing jail population in the age of prison realignment.

"We continue to update our facilities and improving the level of care our medical staff provide in terms of preventative care," Ohannessian said. "There are procedures in place to screen the 83,000 inmates who are booked each year into our facilities."

He noted that in 2008, the San Bernardino County Board of Supervisors approved a \$10.8 million contract with the state to expand a treatment program for mentally ill inmates at the West Valley Detention Center in Rancho Cucamonga that is tailored to restore mental competency to inmates so they can stand trial for the crimes in which they are accused.

"The state would not have entered into a contract with our agency if we were lacking in our ability to care for our inmate population," Ohannessian said. "Our success rate in getting criminal defendants back in court to stand trial has been remarkable, to say the least."

### RECENT DEATHS

Lozano, 34, was arrested about 4:27 p.m. July 26 on suspicion of being under the influence of drugs. She began to suffer a medical emergency while in the back of a patrol car or upon arrival at the jail and was in a semi-conscious state, sheriff's officials said.

According to claims filed with the county on Sept. 26 by members of Lozano's family, Lozano was admitted to the jail in a wheelchair, nude from the waist down and in a semi-conscious state. Her feet were dragging along the ground as she was wheeled into the intake area of the jail, as the wheelchair had no footplates. She was "dumped" from the wheelchair onto the floor of a "sobering cell" and left there for hours without appropriate medical attention.

Lozano stopped breathing at 8:50 p.m. and was taken to Victor Valley Global Medical Center in Victorville, where she died at 11:11 p.m. the same night, Ohannessian said.

Brunner and Terrell said they plan on filing a federal lawsuit this week with more than a dozen causes of action including wrongful death, denial of medical care and civil rights violations.

Lozano's death was followed by three more deaths at other county jails in September, with two of them occurring on the same day.

On Sept. 24, a deputy found 44-year-old inmate Albert Snell hanging by a sheet from the top bunk of his cell at 3:09 a.m. at the West Valley Detention Center in Rancho Cucamonga. The deputy cut the sheet and began CPR. Medical personnel summoned to the cell took over when they arrived, but it was too late. Snell was taken to the hospital, where he died at 4:02 a.m., according to the Sheriff's Department.

Several hours later, at about 8:43 a.m., inmate Jacob Hoyo, 29, suffered a seizure at the jail. He was taken to the hospital, where he died at 10:12 a.m.

Prior to being into the jail, Hoyo had been involved in a traffic collision and was arrested for a DUI. He was treated at a hospital and medically cleared by doctors for booking at the jail, sheriff's officials said.

About 9 p.m. on Sept. 29, a deputy at the sheriff's Morongo Basin jail in Joshua Tree found inmate Henry Simmons, 60, of Joshua Tree, dead in his cell. Earlier in the day, at 12:51 p.m., he was arrested at the Hi-Desert Medical Center, in Joshua Tree, and booked into the jail on suspicion of being under the influence of a controlled substance, according to a Sheriff's Department press release.

The Riverside County Coroner's Office conducted the autopsy on Simmons, the results of which are pending.

Ohannessian said an in-custody death is "always tragic" and not something the Sheriff's Department takes lightly.

"Our specialized detectives conduct a full investigation in every case and the results of those investigations are examined at the highest level in our department to ensure safety concerns of the inmates and staff are adequately addressed," Ohannessian said in an email. "Within the last couple years, hundreds of camera systems have been installed in the jails as an added tool to monitor inmates. Deaths of incarcerated individuals will always be a concern for any agency, who all have their share of these types of cases. Whether they are medical in nature, suicides or other, we try our best to intercede and get them help."

### PRACTICE & POLICY

Despite the Sheriff's Department's firm stance that inmates at its jails receive appropriate and expeditious medical care as needed, it counters hundreds of inmate complaints that have poured into attorney offices in recent years alleging the exact opposite, including Brunner's and Terrell's offices and the Berkely-based Prison Law Office, a prisoner advocacy nonprofit.

In February 2016, the Prison Law Office filed a class action lawsuit against the county alleging drastically deficient medical and mental health inmate care as well as other civil rights violations at San Bernardino County jails.

"Jail medical, mental health and dental care is so deficient that it is harming the people it aims to serve," according to the lawsuit, filed in U.S. District Court in Riverside

Terrell, one of the Victorville attorneys representing the family of Lozano, said, "We receive countless letters (from inmates) each month, and they're all about medical abuse. Eighty or 90 percent are about just total neglect."

Data from the U.S. Department of Justice's Bureau of Justice Statistics underscore the importance of adequate medical and treatment for prisoners.

In 2011–2012, an estimated 40 percent of state and federal prisoners and jail inmates reported having a current chronic medical condition while about half reported ever having a chronic medical condition. Additionally, 21 percent of prisoners and 14 percent of jail inmates reported ever having tuberculosis, hepatitis B or C, or other STDs (excluding HIV or AIDS). Female prisoners and jail inmates were more likely than males to report ever having a chronic condition according to BJS numbers.

Prison Law Office Executive Director Donald Specter said protocol calls for inmates to be interviewed by a nurse during intake, and if the inmate appears to suffer from an urgent medical condition, they're supposed to be referred to a doctor. A special protocol is also supposed to be in place for treating inmates going through drug withdrawal, he said.

"If it's an emergency, then they're not supposed to be admitted to the jail, but taken to a hospital," Specter said. "If it's something that can be taken care of within the jail, they're supposed to be referred to a clinician who has the authority and training to treat them."

Specter said he visited the High Desert Detention Center in Adelanto about a month after Lozano's death and noticed a problem with how inmates were being medically screened during intake.

"The nurses were not doing the (medical) evaluations," said Specter, adding that the medical evaluations were being done by sheriff's deputies and that the evaluations were not being done in private.

"That's what I learned while I was there – the deputies are doing the medical and mental health intake and are completing the forms," Specter said.

https://www.sbsun.com/2017/10/20/deaths-at-san-bernardino-county-jails-sound-an-alarm/

Specter said the Prison Law Office is in settlement negotiations with the county regarding its class-action lawsuit, and one of the things the Sheriff's Department has agreed to do is implement sweeping reforms including a revamping of its inmate intake procedures. That includes, among other things, videoconferencing capabilities that allow clinical staff at other facilities to participate in intake procedures, implementation of a tuberculosis screening protocol that conforms to Centers for Disease Control guidelines and adopting withdrawal assessment and treatment protocols.

## MOVING FORWARD

Ohannessian said the Sheriff's Department has been working cooperatively with the Prison Law Office for more than a year to address its claims, and that all county jails are inspected by the California Board of State and Community Corrections (BSCC) to ensure they meet the requirements set by the state.

Still, the impact prison realignment has had on county jails cannot be ignored, sheriff's officials maintain.

Prison realignment, or AB109 (the Assembly Bill for which the law is based), took effect in California in October 2011, shifting many prisoners serving longer sentences into county jails instead of state prison and resulting in sharp increases in both inmate-on-inmate violence and violent confrontations between inmates and deputies.

Additionally, arrestees suffering from drug abuse and chronic medical conditions such as cancer, HIV, dialysis, and mental health issues require substantially more resources for ongoing treatment, Ohannessian said.

The demand for increased medical and mental health care and resources for inmates has grown by leaps and bounds in the last several years.

In 2012, physician clinics at county jails averaged 2,100 patients per month. Today, the clinics average 5,200 patients per month, Ohannessian said.

In 2012, jail nursing clinics averaged 4,500 patients per month, and today they average 7,200 patients a month. Offsite specialty clinic referrals averaged 120 patients per month in 2010 and had increased steadily, with the average now at 220 patients per month, Ohannessian said.

Referrals for mental health care at county jails averaged 900 patients per month in 2012. That average is now 1,400 patients per month. Out of the approximately 6,000 inmates now in custody, 1,100 have been identified with a history of mental health issues and are receiving medications and/or therapy, Ohannessian said.

As the Sheriff's Department continues grappling with the issues surrounding inmate monitoring, medical and mental health care, its harshest critics continue to ask: Why are inmates still dying at such alarming rates?

"It's a problem that has to be addressed because more people are going to die," said Woodland Hills attorney Dale K. Galipo, who is partnering with Brunner and Terrell on the Lozano case.

Citing the recent deaths at the jails, Galipo said the county has a long way to go before the ideal is met.

"I think that, clearly, there's a lot of work to be done to get to the bottom of it, to compensate the victims and to find out what the current policies are and how it needs to change to ensure this doesn't happen in the future," he said.

---

Want local news?

# Sign up for the Localist and stay informed

Enter your email to subscribe

**SUBSCRIBE**

Tags: **Top Stories IVDB**, **Top Stories PE**, **Top Stories RDF**, **Top Stories S**



SPONSORED CONTENT

https://www.sbsun.com/2017/10/20/deaths-at-san-bernardino-county-jails-sound-an-alarm/



## Man Pulls Hidden String In Attic And Discovers Secret Room Filled With... ⬏

By Upbeat News

### upbeat

Man pulls a mysterious string in his attic which opens to a crawl space filled with mysterious artifacts....

---

# Joe Nelson

Joe Nelson is an award-winning investigative reporter who has worked for The Sun since November 1999. He started as a crime reporter and went on to cover a variety of beats including courts and the cities of Colton, Highland and Grand Terrace. He has covered San Bernardino County since 2009. Nelson is a graduate of California State University Fullerton. In 2014, he completed a fellowship at Loyola Law School's Journalist Law School program.

🐦 Follow Joe Nelson @GumshoeJoe



MARRIOTT BONV♥Y

The Westin San Diego, California

From $ 119

BOOK NOW

https://www.sbsun.com/2017/10/20/deaths-at-san-bernardino-county-jails-sound-an-alarm/

# EXHIBIT 7

**LOCAL NEWS**

# In-custody deaths in San Bernardino County jails sounding an alarm

By **BRIAN ROKOS** | brokos@scng.com and **JOE NELSON** | jnelson@scng.com | The Press-Enterprise
April 13, 2016 at 12:15 am

In the last year, a dozen people have died after being admitted into San Bernardino County jails, with more than half those deaths occurring in the last four months.

Since January, seven people have died in county jails — more than all the in-custody deaths that occurred in 2015. Four of those deaths are attributed to pre-existing medical conditions and one a suicide by hanging. The causes of death for two other inmates have yet to be determined, but homicide and suicide have been ruled out, said sheriff's Lt. Brad Toms.

Of 2015's five deaths, three were suicides, one was a homicide and one a medical-related death, according to the sheriff's department.

"I think that's an alarming number," said Dale Galipo, a Woodland Hills attorney who specializes in civil rights and wrongful death cases involving law enforcement, many of them originating in the Inland Empire.

"I don't know all the details, but I think the people in charge of these jails should be concerned and look into the details of each case, what happened and what went wrong and what steps they could take to prevent these deaths from happening in the future," Galipo said.

https://www.sbsun.com/2016/04/13/in-custody-deaths-in-san-bernardino-county-jails-sounding-an-ala...

Case 5:19-cv-02300-JGB-KK Document 60-11 Filed 05/03/19 Page 108 of 113 Page #:108

The latest death occurred Sunday, when 32-year-old Riverside resident Cleveland Burris was found unresponsive in his single-man cell at the West Valley Detention Center in Rancho Cucamonga at 7:52 a.m. He was taken to Kaiser Permanente Fontana Medical Center, where he was pronounced dead at 8:47 a.m., authorities said.

Five days prior, on April 5, 48-year-old Michael Paul hanged himself with his shoelaces in a single-man cell at the Twin Peaks sheriff's station after being arrested on suspicion of being under the influence of drugs, according to sheriff's officials and Paul's mother, Joan Davis.

Despite the number of in-custody deaths since January, Toms said all inmates are screened by registered nurses during intake for pre-existing medical and mental health problems. Inmates who appear to suffer from acute medical conditions are taken to a hospital and not returned to jail until they are cleared by a doctor, Toms said.

But that doesn't necessarily safeguard inmates from suffering a life-threatening medical emergency.

"There are just medical conditions that are going to happen," Toms said, disputing claims that inmates are subjected to long waits before being seen by a doctor or mental health professional.

"If anything, the time has shortened because we have more staff now," Toms said, adding that electronic kiosks are being installed at West Valley that will allow inmates to request appointments online, thus expediting the process.

Since prison realignment took effect in October 2011, the sheriff's department has grappled with meeting inmate demands for medical and mental health services while facing a sharp increase in inmate-on-inmate and inmate-on-deputy violence as more violent criminals are pouring into the jails, and for longer stays, Toms said.

Sheriff John McMahon was out of town and unavailable for comment Tuesday.

Experts and law enforcement officials say the number of in-custody deaths can be cyclical and defy explanation. After Riverside County reported 10 jail deaths in 2012, three in 2013 and one in 2014, there were 11 in 2015. But there hasn't been any in 2016, Assistant Sheriff Jerry Gutierrez said.

Experts say it is important to look at each death individually before drawing conclusions on whether there is a trend borne out of problems with correctional deputies or policies.

Michael Hackett, a retired assistant sheriff in Imperial County and former chief administrative officer for the Santa Clara County Department of Corrections, is an Oceanside-based criminal justice consultant who testifies as an expert witness on jail and police practices.

He was not aware of the facts of the San Bernardino cases and on Tuesday spoke generally about best practices for jails. Hackett discussed three categories of inmate deaths: homicides, suicides and medical emergencies.

"Essentially," Hackett said, "homicides are not preventable inside or outside the jail. If somebody has decided he is going to take a life, it probably is going to happen."

The best way to prevent inmates from killing each other, Hackett said, is to make sure incompatible inmates are not placed in the same cell. That includes rival gang members and those accused of misdemeanors and serious felonies.

"You can't necessarily forecast the behavior of every inmate, but you can get a handle on it," he said.

Galipo, the Woodland Hills attorney, is suing the county on behalf of the parents of Rashad Davis Jr., a 19-year-old developmentally disabled Ontario man allegedly beaten to death by his cellmate, Jeremiah Bell, at West Valley in May. It was the only homicide logged at the jail in 2015.

Davis was jailed on suspicion of armed robbery and petty theft, while Bell, determined by a judge to be mentally incompetent to stand trial, was suspected of beating a Rialto man to death with a baseball bat.

With jail suicides, Hackett attributes those to either problems in the screening process or suspects hiding their intentions from jailers.

Lindsay Hayes, project director at the Baltimore-based National Center on Institutions and Alternatives and a nationally recognized expert on jail suicides, said a comparison of the number of suicides per 100,000 inmates from jail to jail is a better measure than raw numbers.

Hayes said jails with a low suicide rate are proactive with prevention programs.

"They don't wait for tragedy to happen," he said Tuesday from Mansfield, Massachusetts.

But there's more to suicide prevention than having a program in place.

"There are a lot of jurisdictions that follow their policies and procedures on suicide prevention, but they don't have good policies and procedures," Hayes said.

The Prison Law Office, a Berkeley-based nonprofit that advocates for prisoner rights, has fielded more than 700 complaints from inmates in San Bernardino County jails, alleging a pattern of excessive force by deputies against inmates and substandard medical and mental health care. The office alleged a "culture of violence" in San Bernardino County's jail system in an eight-page letter to McMahon in August 2014.

In February, the Prison Law Office filed a class-action lawsuit against the county on behalf of two West Valley inmates, alleging excessive use of force by deputies and substandard medical, mental health and dental care.

Prison Law Office Director Don Specter said in a telephone interview Tuesday that no additional plaintiffs have joined the lawsuit since it was filed.

He found the news about the in-custody deaths alarming.

"It raises serious concerns," said Specter. "It creates a sense of urgency."

He said San Bernardino County isn't the only county experiencing such problems.

In October, the Prison Law Office tentatively settled a class-action lawsuit filed in Riverside County, challenging the quality of medical and mental health care for inmates in the county's five jails.

"It's a statewide problem. A lot of counties are in this boat," Specter said.

Galipo said the issue boils down to policies, procedures and training to ensure inmates are housed safely and properly monitored by the deputies tasked with their safety.

"The reality is most of the people there are accused of a crime, not convicted of a crime, and it shouldn't be a death sentence for them," Galipo said.

## IN-CUSTODY DEATHS IN SAN BERNARDINO COUNTY JAILS: APRIL 1, 2015 TO PRESENT

4/1/15 Gilbert Mesa. Age: 33. Sheriff's Big Bear jail. Cause: suicide.

5/22/15 Rashad Davis Jr. Age: 19. West Valley Detention Center. Cause: homicide.

9/12/15 Karla Jones. Age: 23. West Valley Detention Center. Cause: suicide.

10/18/15 Robert Lundberg. Age: 50. West Valley Detention Center. Cause: suicide.

12/6/15 Salvador Munoz. Age: 54. West Valley Detention Center. Cause: medical-related.

1/4/16 Fernando Cordova. Age: 58. West Valley Detention Center. Cause: medical-related.

2/7/16 Michael O'Brien. Age: 40. West Valley Detention Center. Cause: medical-related

2/28/16 Angela Zuniga. Age: 33. West Valley Detention Center. Cause: medical-related

3/27/16: Federico Juarez Guardado. Age: 30. West Valley. Cause: medical-related

4/5/16: Michael Paul. Age: 48. Sheriff's Twin Peaks jail. Cause: suicide.

4/10/16: Cleveland Burris. Age: 32. West Valley Detention Center. Cause: medical-related

*Staff Writer Doug Saunders contributed to this report.*

---

Want local news?

# Sign up for the Localist and stay informed

Enter your email to subscribe

**SUBSCRIBE**

# Brian Rokos

Brian Rokos writes about public safety issues such as policing, criminal justice, scams, how law affects public safety, firefighting tactics and wildland fire danger. He has also covered the cities of San Bernardino, Corona, Norco, Lake Elsinore, Perris, Canyon Lake and Hemet. Before that he supervised reporters and worked as a copy editor. For some reason, he enjoys movies where the Earth is threatened with extinction.

🐦 Follow Brian Rokos @Brian_Rokos



SPONSORED CONTENT

## 64 Unedited Photos From The Past- Viewer Discretion Advised ⬏

By History Daily

HISTORY DAILY

Vintage Photos Previously Withheld Until Now

# Joe Nelson

Joe Nelson is an award-winning investigative reporter who has worked for The Sun since November 1999. He started as a crime reporter and went on to cover a variety of beats including courts and the cities of Colton, Highland and Grand Terrace. He has covered San Bernardino County since 2009. Nelson is a graduate of California State University Fullerton. In 2014, he completed a fellowship at Loyola Law School's Journalist Law School program.

🐦 Follow Joe Nelson @GumshoeJoe

